MIGUEL SANTIAGO, demandante y apelante, *v.* LA COMISIÓN DE SERVICIO PÚBLICO DE PUERTO RICO, y LA WHITE STAR BUS LINE, INC., demandadas y apeladas.

No. 4398.—*Visto:* Noviembre 23, 1927.   *Resuelto:* Diciembre 21, 1927.

1. LICENCIAS—NATURALEZA DE LAS MISMAS—MEDIOS DE TRANSPORTE—VEHÍCULOS PARA EL TRANSPORTE DE PASAJEROS.—Un certificado de necesidad y conveniencia expedido por la Comisión de Servicio Público para explotar por cierto tiempo un automóvil en el transporte de pasajeros, no constituye la concesión de una franquicia; es una medida regulatoria, una licencia personal, de naturaleza revocable.

2. COMISIONES DE SERVICIO PÚBLICO—ACCIONES PARA MODIFICAR, SUSPENDER, DETENER O ANULAR ORDENES DE LA COMISIÓN—INJUNCTION—PERSONAS QUE PUEDEN EJERCITAR EL REMEDIO.—Cuando un ciudadano se ve privado de ejercer una de las ocupaciones ordinarias de la vida, tiene derecho a llevar su caso ante las cortes y éstas el deber de resolverlo en justicia.

3. COMISIONES DE SERVICIO PÚBLICO—ACCIONES PARA MODIFICAR, SUSPENDER, DETENER O ANULAR ORDENES DE LA COMISIÓN—INJUNCTION—PROCEDENCIA DEL REMEDIO.—Aún cuando en la opinión se discute si el *procedimiento de injunction* escogido por el demandante en este caso es o no el apropiado, tal cuestión, sin embargo, no se resuelve.

4. COMISIONES DE SERVICIO PÚBLICO—PRECEPTOS CONSTITUCIONALES—INTERPRETACIÓN.—La Ley Butler (44 U. S. Stat. at Large, 2da. parte, 1418) reorganizó y no abolió la Comisión de Servicio Público creada por la Ley Jones de 1917.

5. COMISIONES DE SERVICIO PÚBLICO—REORGANIZACIÓN—EN GENERAL.—Habiéndose sólo reorganizado por la Ley Butler la Comisión de Servicio Público creada por la Ley Jones de 1917, dicha Comisión tal como estaba constituída tenía derecho a continuar actuando en casos pendientes ante ella por un período de tiempo razonable mientras fueran hechos los nuevos nombramientos.

6. PORTEADORES—EN GENERAL—PODER PARA REGLAMENTAR EL SERVICIO.—La circunstancia de que al final de la sección 38 del Acta Orgánica se confiera expresamente a la Legislatura poder para decretar leyes relativas a la reglamentación de los precios, tarifas y servicios de los porteadores públicos por ferrocarril en Puerto Rico, no implica que la Legislatura no tenga poder para reglamentar el servicio de porteadores públicos por otras vías.

7. DERECHO CONSTITUCIONAL—DISTRIBUCIÓN DE PODERES Y FUNCIONES GUBERNAMENTALES—PODER LEGISLATIVO Y DELEGACIÓN DEL MISMO—DELEGACIÓN—AUTORIDADES LOCALES—CUERPOS LEGISLATIVOS INFERIORES. — La autoridad original para la concesión de franquicias radica en la Legislatura, pero dicha autoridad puede delegarse por ella a cuerpos legislativos inferiores.

8. COMISIONES DE SERVICIO PÚBLICO—PRECEPTOS CONSTITUCIONALES—INTERPRETACIÓN.—Cuando el Congreso de los Estados Unidos resolvió crear una Comisión de Servicio Público en Puerto Rico, lo hizo seguramente con el propósito de implantar en esta Isla el moderno método de resolver las cuestiones relativas a las compañías de servicio público que venían funcionando desde hacía algún tiempo en muchos Estados de la Unión.

9. MONOPOLIOS—VALIDEZ Y EFECTO DE LAS CONCESIONES (*Grants*)—FRANQUICIAS EXCLUSIVAS—TRÁFICO PÚBLICO.—Examinadas la sección 38 de la Ley Jones y la Ley No. 70 de 1917 (2) (pág. 535) a la luz de su historia y de la juris-

prudencia en general, es necesario reconocer que otorgan a la Comisión facultades para conceder la exclusiva en el tráfico público si las circunstancias concurrentes y el bienestar del pueblo en general así lo demandaren.

10. COMISIONES DE SERVICIO PÚBLICO—ACCIONES PARA MODIFICAR, SUSPENDER, DETENER O ANULAR ORDENES DE LA COMISIÓN—REVISIÓN POR LOS TRIBUNALES—ALCANCE DE LA REVISIÓN.—Al revisar las resoluciones de la Comisión de Servicio Público, las cortes deberán investigar si la Comisión tenía o no facultades para dictarlas, y a menos que resulten ilegales, abusivas o arbitrarias, lo que no se ha demostrado en este caso, no tratarán de sustituir su juicio por el juicio de la Comisión, especialmente tratándose de la expedición de un *injunction pendente lite.*

RESOLUCIÓN de *Pablo Berga,* J. (San Juan), declarando no haber lugar a expedir auto de *injunction* preliminar solicitado. *Confirmada.*

*R. Martínez Nadal, M. A. Martínez Dávila* y *L. Tormes,* abogados del apelante; *Hon. Attorney General, George C. Butte, J. López Acosta* y *R. A. Gómez,* Sub-Procuradores, abogados de la *Comisión de Servicio Público; Guerra Mondragón & Soldevila,* abogados de la *White Star Line, Inc.*

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Miguel Santiago, dueño de un ómnibus (guagua) movido por vapor y destinado al servicio de transportar pasajeros entre la ciudad de San Juan, sus barrios y el pueblo de Río Piedras, bajo un certificado de necesidad y conveniencia expedido por la Comisión de Servicio Público de Puerto Rico, radicó en la Corte de Distrito de San Juan una demanda de injunction contra la indicada Comisión y la White Star Bus Line, Inc.,—una corporación organizada de acuerdo con las leyes de Puerto Rico—, a los efectos de que la corte ordenara a los dichos demandados que se abstuvieran de ejecutar acto alguno para poner en práctica la franquicia otorgada por la Comisión a la White Star concediéndole la exclusiva en el negocio de transportación de pasajeros entre San Juan, sus barrios y Río Piedras. Solicitó además el demandante la expedición de un mandamiento preliminar. Se fijó inmediatamente un día para oir a las partes sobre esta petición. Comparecieron, se practicó prueba, se presentaron alegatos, y la corte, el 21 de junio de 1927, la

declaró sin lugar, sugiriendo el juez que dictó la resolución que dada la importancia de las cuestiones envueltas, una vez que el caso estuviera listo para juicio, se hiciera la correspondiente solicitud para que fuera oído *in bank* de acuerdo con el reglamento de la corte. La Corte de Distrito de San Juan se compone actualmente de tres jueces.

No conforme, el demandante interpuso el presente recurso de apelación, habiéndose celebrado la vista del mismo el 23 de noviembre último.

Sólo, pues, pende ante nosotros la solicitud de *injunction* preliminar. La actitud asumida por la corte de distrito al resolverla se basó principalmente en que a su juicio no existían méritos bastantes para concluir que se trataba de un caso urgente que no pudiera esperar la consideración más cuidadosa que necesariamente habría de dársele al resolver el pleito en su fondo.

La petición preliminar y la definitiva presentan, en verdad, los mismos problemas a estudiar y a resolver, pero lo que quizá no era urgente en junio 21, último, lo es ahora, pues a fines del mes de diciembre en curso, de no concederse la solicitud, se encargará la demandada White Star del negocio de que se trata, con exclusión de cualquiera otra persona y por consiguiente del demandante. Y como las partes han discutido por escrito y oralmente todas las cuestiones envueltas, creemos que debemos estudiarlas y resolverlas para despejar la situación, sin que ello quiera decir, por supuesto, que el juicio que formemos no pueda ser variado al verse el caso en su fondo, a virtud de la prueba que se practique y de un estudio más detenido, más hondo.

Continuaremos designando a Miguel Santiago como el demandante, a la Comisión de Servicio Público de Puerto Rico como la Comisión y a la White Star Bus Line Inc. como la White Star.

[1, 2] La primera cuestión que surge es la siguiente: ¿Tiene el demandante personalidad para establecer esta acción?

Sostiene el propio demandante la afirmativa basándose en que es dueño de un ómnibus actualmente dedicado a la transportación de pasajeros, de acuerdo con un permiso que le otorgara la misma Comisión, y si esto no fuera especialmente bastante, en que es un ciudadano con derecho a continuar ganándose la vida en el libre ejercicio de su industria o profesión.

En el acto de la vista del *injunction* preliminar, el demandante, declarando como su propio testigo, dijo: que era dueño de una guagua marca "Federal" valorada en cuatro mil dólares y destinada al transporte de pasajeros entre San Juan, sus barrios y Río Piedras, de acuerdo con un certificado que le había otorgado la Comisión y que vencería el 30 de junio de 1927. Dijo además que de conformidad con lo dispuesto por la Comisión, la licencia se había extendido hasta el 31 de diciembre de 1927; que él estaba dispuesto a continuar en el negocio cumpliendo con las reglas de la Comisión; que los certificados o licencias se otorgaban por seis meses y continuaban renovándose por otros seis siempre que se cumpliera con la ley y los reglamentos, y que hasta el momento de presentar su petición no había sido perturbado en su negocio, pero tendría que separarse por completo de él en diciembre 31, 1927, si la franquicia que impugnaba quedaba en pie.

El testigo Luis Freyre Díaz, empleado de la Comisión encargado del trabajo de las guaguas, dijo que los certificados de necesidad y conveniencia que se expedían por la Comisión para el tráfico de San Juan a Río Piedras se renovaban una vez vencidos, si el tenedor de los mismos cumplía con los requisitos exigidos por la Comisión; que no se renovaban automáticamente, sino a virtud de un acuerdo de la Comisión.

El certificado en cuestión se presentó como prueba. Copiado a la letra, dice:

"Caso No. cn. 436. Cert. No. 359. Comisión de Servicio Público de Puerto Rico. Licencia Semestral. Itinerario: Tarifa: San

Juan-Río Piedras. 5 A. M. a 12 P. M.—5 cts. San Juan-Martín Peña y 5 cts. Martín Peña-Río Piedras.—Quintana Racing Park: San Juan-Quintana 15 cts. Parada 15-Quintana 10 cts.

"El infrascrito Secretario de la Comisión de Servicio Público de Puerto Rico por la presente,

"CERTIFICA: Que Miguel A Santiago. dueño de este vehículo de motor, marca Federal, No. de fábrica 124–6M, licencia No. P.–54, ha cumplido con todos los requisitos reglamentarios y obtenido de la Comisión de Servicio Público un certificado de necesidad y conveniencia que le autoriza a explotar este vehículo como porteador público entre los puntos arriba indicados.

"Dada en San Juan, Puerto Rico, hoy día 13 de enero de 1927. (Fdo.) Francisco del Valle, Jr., Secretario Comisión de Servicio Público.

"La capacidad autorizada de este vehículo es de 22 pasajeros.

"La presente licencia es válida hasta junio 30, 1927.

"Guagua nombrada Gold Dust.

"Póliza vence enero 25, 1927. Certificado vence junio 30, 1927. P. R. Am.

"Nota: Esta licencia no podrá ser transferida sin el consentimiento y aprobación de la Comisión de Servicio Público y deberá fijarse al público en un sitio visible del vehículo del mismo modo que la tarifa e itinerario autorizados.

"(Hay un sello de rentas internas de 25 centavos, cancelado)."

Un certificado de esa naturaleza no constituye la concesión de una franquicia. Es una medida estrictamente regulatoria. Es meramente un permiso para usar un camino público. Es una licencia personal, de naturaleza revocable. *Western Motor Transportation Co.,* P.U.R. 1922 C., p. 13; *Oro Electric Corporation* vs. *Commission,* 169, Cal. 456; *Troy Auto Co.,* P.U.R. 1917 A, p. 700; Babbit on *The Law Applied to Motor Vehicles,* sección 209.

Pero es que ni siquiera está envuelta aquí la eficacia del permiso. El surtió todos sus efectos. Estuvo vigente durante todo el tiempo fijado en el mismo. No fué en modo alguno revocado por la Comisión, ni obstaculizado por la White Star. Su vida sólo alcanzaba hasta el 30 de junio de 1927. Es más, si el demandante ha continuado en su negocio después del 30 de junio último, lo ha sido por el per-

miso concedido por la Comisión en la propia franquicia que se impugna.

Comprendiéndolo así, el demandante sostiene que el permiso era prorrogable siempre que se cumplieran las reglas de la Comisión y que como él estaba dispuesto a cumplir con esas reglas, el permiso le hubiera sido necesariamente prorrogado y hubiera podido así continuar dedicándose a su negocio después del 31 de diciembre de 1927, a no ser por la franquicia otorgada a la White Star.

El permiso no contiene cláusula alguna sobre prórroga. El testigo Freyre no dijo que los permisos se prorrogaran automáticamente, ni que la Comisión estuviera obligada a prorrogarlos. Lo que se expedía era otro nuevo permiso también por tiempo limitado. La idea de la prórroga surge de la continuidad del negocio, pero en realidad de verdad se trataba en cada caso de un permiso diferente.

Ni el permiso que venció el 30 de junio de 1927, ni el alegado derecho a su prórroga son en tal virtud suficientes por sí solos para que el demandante pudiera proseguir con éxito esta acción.

Veamos si uniéndolos a la base más amplia del derecho del demandante como ciudadano a continuar dedicándose al libre ejercicio de su negocio, dan al demandante la personalidad necesaria para llevar su asunto a los tribunales y obtener de éstos una resolución en justicia.

En el caso de *Allgeyer* vs. *Luisiana*, 165 U. S. 578, 589, citado por esta Corte Suprema en el de *El Pueblo* v. *Correa*, 31 D.P.R. 531, 540, al emitir la opinión del tribunal, el Juez Peckham se expresó así:

"Se dijo por el Juez Sr. Bradley en el caso de Butcher's Union Company vs. Crescent City Company, 111 U. S. 746, 762, en el curso de su opinión concurrente, que 'El derecho a seguir cualquiera de las ocupaciones comunes a la vida es un derecho inalienable. Se formuló como tal de acuerdo con la frase "prosecución de la felicidad" contenida en la Declaración de Independencia, que comenzaba con la proposición fundamental de que "todos los hombres han

sido creados iguales, que el Creador los ha dotado de ciertos dere-
chos inalienables; que entre éstos están la vida, la libertad y la
prosecución de la felicidad.'' Este derecho es un gran elemento en
la libertad civil del ciudadano.' Nuevamente, en la página 764,
este erudito juez dijo: 'Sostengo que la libertad de acción—el de-
recho a seguir cualquiera de las vocaciones ordinarias de la vida—
es uno de los privilegios de los ciudadanos de los Estados Unidos.'
Y una vez más, en la página 765 dice: 'Pero si no limita los privi-
legios e inmunidades de un ciudadano de los Estados Unidos pro-
hibiéndole seguir su vocación y dando a otros un derecho exclusivo
de dedicarse a ella, ciertamente que le priva (hasta cierto punto)
de su libertad; pues le quita la libertad de adoptar y seguir el
curso que desee; lo cual según se ha dicho, es parte esencial de la
libertad del ciudadano.' Es cierto que estas observaciones fueron
hechas respecto a cuestiones de monopolio, pero ellas determinan
bien los derechos comprendidos en la palabra 'libertad,' según es-
tán contenidos en la enmienda décimocuarta.

''Y también, en el caso de Powell vs. Pennsylvania, 127 U. S.
678, 684, el Juez Sr. Harlan, al emitir la opinión del tribunal, se
expresó como sigue:

'' 'La principal cuestión levantada por el demandado es que, el
gozar por igual con todos los que se hallan en circunstancias simila-
res, del privilegio a seguir una vocación u oficio, de adquirir, po-
seer y vender propiedad, forma parte integrante de sus derechos
de libertad y propiedad, tal como están garantizados por la en-
mienda décimocuarta. La corte está de acuerdo con esta proposi-
ción general porque abarca un sano principio de derecho constitu-
cional.' ''

Inspirándose en los anteriores principios, no es posible
desconocer la personalidad del demandante para acudir a
los tribunales en demanda de justicia. El es un ciudadano
que ha empleado su dinero en la compra de un ómnibus para
dedicarse a un negocio lícito acatando la ley existente en la
actualidad y con la esperanza de continuar en el mismo, y él
se vería enteramente privado de su ejercicio si la franquicia
de que se trata queda en todo su vigor.

[3] Decidido este extremo, veamos si el procedimiento
de *injunction* escogido por el demandante es o no el apro-
piado.

La Comisión demandada fué creada por el Congreso de los Estados Unidos en 1917. La sección 38 de nuestra Ley Orgánica dice:

"Artículo 38.—Toda concesión de franquicias, derechos y privilegios de carácter público o cuasi público. será otorgada por una Comisión de Servicio Público, compuesta de los jefes de los departamentos ejecutivos, el Contador, y dos comisionados que se elegirán, por los electores capacitados, en la primera elección general que habrá de celebrarse de acuerdo con esta Ley, y después en cada elección general subsiguiente. El término del cargo de dichos comisionados electivos elegidos en la primera elección general, comenzará el vigésimo octavo día después de dicha elección general, y el término del cargo de dichos comisionados electivos elegidos en cada elección general subsiguiente, comenzará el segundo día de enero siguiente a su elección; ellos servirán sus cargos durante cuatro años y hasta que sus sucesores sean electos y tomen posesión. Su remuneración será de $8 por cada día de asistencia a las sesiones de la comisión; pero en ningún caso recibirán más de $400 cada uno durante un solo año. Dicha comisión queda también autorizada, y así se le ordena, para desempeñar todas las funciones ejecutivas, referentes a corporaciones de servicio público, hasta ahora conferidas por ley al Consejo Ejecutivo. Las franquicias, derechos y privilegios concedidos por la mencionada comisión no entrarán en vigor hasta que sean aprobados por el Gobernador, y deberán ser comunicados al Congreso, el cual se reserva por la presente la facultad de anularlos o modificarlos.

"No serán aplicables a Puerto Rico la Ley sobre comercio entre Estados y las varias enmiendas hechas o que se hagan a ella, las Leyes sobre aparatos de seguridad y las diferentes enmiendas hechas o que se hagan a las mismas, y la Ley del Congreso titulada 'Ley para enmendar una Ley titulada "Ley para regular el comercio," aprobada en febrero 4 de 1887, y todas las leyes que la enmiendan, en el sentido de proveer para una valuación de las diferentes clases de bienes de los porteadores sujetos a dicha Ley, y para obtener informes concernientes a sus acciones, bonos y otros valores,' aprobada el 1 de marzo de 1913.

"La Asamblea Legislativa de Puerto Rico queda autorizada por la presente para decretar leyes relativas a la reglamentación de los precios, tarifas y servicio de los porteadores públicos por ferrocarril en Puerto Rico, y la Comisión de Servicio Público creada por

esta Ley tendrá facultad para poner en ejecución leyes de ese carácter mediante reglamentación adecuada.''

Y en el propio año de 1917 la Legislatura de Puerto Rico aprobó la Ley No. 70, definiendo las compañías de servicio público y proveyendo lo necesario para su reglamentación; prescribiendo, definiendo, reglamentando y limitando sus derechos, facultades y deberes; prescribiendo y definiendo las facultades y deberes de la Comisión de Servicio Público y los de sus funcionarios; prescribiendo y reglamentando la práctica y el procedimiento ante dicha Comisión y en apelación, y para otros fines.

Es esa ley No. 70 una pieza legislativa amplia y completa que comienza por definir cuáles son las corporaciones de servicio público y termina por regular la práctica y el procedimiento ante la comisión y en apelación. De acuerdo con su artículo 2, el demandante, en sí mismo, constituye una compañía de servicio público, porque son compañías de servicio público, a los efectos de la ley, ''las personas naturales o jurídicas que se dediquen en Puerto Rico a cualesquiera de los fines o negocios siguientes: (*a*) Transporte de personas o carga utilizando en todo o en parte las vías marítimas, fluviales o terrestres . . . . .'' Y la White Star, otra.

De conformidad con las prescripciones de la misma ley, la franquicia otorgada a la White Star debió serlo mediante el procedimiento en ella establecido. Y parece lo lógico que para impugnarla se hubiera seguido el procedimiento también establecido en la propia ley, entablándose la correspondiente apelación ante la Corte de Distrito de San Juan.

''No se dictará *injunction* alguno modificando, suspendiendo, deteniendo, o anulando ninguna orden de la Comisión o de un comisionado, excepto mediante previa notificación a la Comisión y después de causa justificada demostrada en una vista. La Corte de Distrito de San Juan, Sección Primera, queda por la presente investida con jurisdicción exclusiva en todo Puerto Rico sobre todos los procedimientos de dicho *injunction* con sujeción a apelación para ante la

Corte Suprema, según se ha expresado,''—dice el artículo 91 de la Ley No. 70, después de haber regulado en artículos anteriores el procedimiento de la apelación.

Si se hubiera seguido el procedimiento marcado por la propia ley y dentro del mismo se hubiera pedido la expedición del auto de *injunction,* la corte de distrito hubiera tenido el beneficio de una copia de todos los procedimientos seguidos ante la Comisión y hubiera estado en mejores condiciones para impartir justicia.

Pero, dejando a un lado esta cuestión, sin que ello quiera decir que resolvamos que no tiene razón la parte demandada al suscitarla, procederemos a estudiar las dos cuestiones verdaderamente fundamentales envueltas en el litigio, a saber: ¿Estaba debidamente constituída la Comisión cuando concedió la franquicia de que se trata? Si lo estaba, ¿tuvo facultades para concederla en la forma en que lo hizo?

[4, 5] La Comisión tal como quedó organizada de acuerdo con las leyes citadas (artículo 38 del Acta Orgánica y Ley No. 70 de 1917) actuó el 9 de abril de 1927 concediendo la franquicia. Y el demandante sostiene que como para esa fecha ya estaba en todo su vigor la ley del Congreso de los Estados Unidos ''para enmendar y re-enactar los artículos 3, 20, 31, 33, 38 y 48 de la Ley de marzo 2, 1917, titulada 'Ley para proveer un gobierno civil para Puerto Rico y para otros fines,' tal como quedó enmendada por la ley aprobada en junio 7, 1924, y para insertar un nuevo artículo en dicha ley entre los artículos 5 y 6 de la misma que será designado como '5A' de dicha ley,'' aprobada el 4 de marzo de 1927 (44 United States Statutes At Large, Segunda Parte, 1418) y conocida generalmente por la Ley Butler, la dicha Comisión actuó sin poder alguno y la franquicia por ella concedida es nula por completo.

Es correcta la afirmación del demandante con respecto a las fechas de la concesión de la franquicia y de la aprobación de la Ley Butler, y es cierto que la Comisión que actuó concediendo la franquicia fué la constituída con arreglo al

Acta Orgánica de 1917 y a la Ley No. 70 a que nos hemos referido anteriormente.

A nuestro juicio, es de importancia decisiva decidir si la Ley Butler abolió la Comisión creada por el Acta Orgánica, como sostiene el demandante, o meramente la reorganizó.

Conocemos su título. Parece conveniente transcribir la sección 38, tal como quedó por ella "enmendada y re-enactada." Es así:

"Artículo 38.—Toda franquicia, derecho, privilegio y concesión de carácter público o cuasi público, será otorgada por una Comisión de Servicio Público compuesta de un Comisionado de Servicio Público, que será Presidente de dicha Comisión, y dos comisionados asociados nombrados por el Gobernador con el consejo y consentimiento del Senado. El Comisionado de Servicio Público será nombrado por un período de tres años y hasta que sea nombrado su sucesor y hubiera éste tomado posesión de su cargo; y uno de dichos comisionados asociados, primeramente nombrados, desempeñará el cargo por un término de dos años y uno por el término de un año, y después cada uno de dichos comisionados asociados desempeñará el cargo por un período de tres años y hasta que su sucesor haya sido nombrado y hubiera tomado posesión de su cargo; *Disponiéndose,* que los actuales comisionados electivos de la mencionada Comisión continuarán en sus cargos hasta el vencimiento de sus términos, tal como se dispone actualmente por la ley, y junto con los tres miembros nombrados por el Gobernador formarán la Comisión, según queda dicho, hasta la terminación del período de sus servicios y no después. El sueldo del Comisionado será $6,000 por año. Este dedicará todo su tiempo a sus deberes como tal Comisionado. La compensación de los miembros asociados, tanto los elegidos como los de nombramiento, será 10 dólares por cada día de asistencia a las sesiones de la Comisión; pero en ningún caso recibirán más de $1,000 durante ningún año. Dicha Comisión queda facultada para desempeñar, y se le ordena que desempeñe, todas las funciones ejecutivas relacionadas con las corporaciones de servicio público que hasta ahora se han conferido por la ley al Consejo Ejecutivo, y aquellos deberes y funciones adicionales que se confieran a dicha Comisión por la Asamblea Legislativa. Ninguna franquicia, derecho y privilegio que otorgare la mencionada Comisión tendrá efecto hasta que haya sido aprobado por el Gobernador y se hubiese in-

formado al Congreso, el cual por la presente se reserva la facultad de anularlos o modificarlos.

"No serán aplicables a Puerto Rico la Ley sobre Comercio Interestadual y las varias enmiendas hechas o que se hagan a ella; las leyes sobre aparatos de seguridad y las diferentes enmiendas hechas o que se hagan a las mismas; ni la Ley del Congreso titulada 'Ley para regular el comercio,' aprobada en febrero 4 de 1887, y todas las leyes que la enmienden en el sentido de proveer para una valuación de las diferentes clases de bienes de los porteadores sujetos a dicha Ley, y para obtener informes concernientes a sus acciones, bonos y otros valores,' aprobada el 1 de marzo de 1913.

"La Asamblea Legislativa de Puerto Rico queda autorizada por la presente para decretar leyes relativas a la reglamentación de los precios, tarifas y servicios de todos los porteadores públicos en Puerto Rico, y la Comisión de Servicio Público creada por esta Ley tendrá facultad para poner en ejecución las leyes de ese carácter mediante reglamentación adecuada."

A juzgar por el título de la ley y por el contenido de la enmienda, la Comisión no fué abolida, ni variada en sus propósitos de tal modo que pueda considerarse que la intención del Congreso fué crear un organismo distinto del anterior. La Comisión fué reorganizada y nada más. En su informe en relación con la ley, el Senador Butler se expresó así:

"En la nueva organización el Presidente de la Comisión dedicará su tiempo exclusivamente al trabajo de la Comisión y recibirá una compensación . . . Se cree que este arreglo será practicable y fácil de llevar a cabo, y que desaparecerán por completo las dificultades que surgen con la presente organización. No se ha hecho cambio de ninguna clase con respecto a los deberes y poderes de la Comisión."

Según el artículo 38 tal como estaba redactado antes de la enmienda, formaban parte de la Comisión los jefes de los departamentos ejecutivos del Gobierno y el Auditor insular con dos comisionados más elegidos por el Pueblo. La vida en Puerto Rico se va tornando cada vez más intensa. La experiencia demostró que era imposible que funcionarios tan ocupados como los que dirigen la administración insular,

pudieran actuar en una comisión de tanta importancia como la de servicio público. De ahí el cambio, que el Congreso en su sabiduría extendió también a los funcionarios electivos, pero reconociendo a los ya elegidos todo el período para el cual recibieron el mandato de su pueblo.

No era posible esperar que el Gobernador seleccionara inmediatamente los nuevos miembros de la Comisión. Tal selección requería un cuidadoso estudio de su parte para proceder con acierto y el consejo y consentimiento del Senado. Asuntos complicados que se venían tramitando desde hacía tiempo se encontraban pendientes. Los dos miembros de la Comisión elegidos por el Pueblo continuarían, como se ha dicho, por unos dos años más en sus cargos, los otros miembros de la Comisión lo eran por razón de los cargos públicos que desempeñaban y continuarían desempeñando no obstante la enmienda de la ley. Bajo tales circunstancias la Comisión resolvió continuar actuando y decidir los asuntos que tenía pendientes, siendo uno de ellos el de la franquicia objeto de este pleito.

Nada dispone expresamente en contrario del curso seguido la Ley Butler. Ella se aprobó para ser incorporada en el Acta Orgánica, y creemos que está bien fundado el argumento de la parte apelada que sostiene que siendo ello así y rigiendo en su integridad la ley enmendada, era aplicable el artículo 56 que entre otras cosas dispone lo que sigue:

"Esta Ley regirá al ser aprobada; pero hasta que sus disposiciones entren en vigor separadamente, según se provee antes en esta Ley, las correspondientes funciones legislativas y ejecutivas del Gobierno de Puerto Rico continuarán ejerciéndose y en completa fuerza y efecto según ahora se dispone por ley . . . . ."

En el caso de *Farrell* vs. *State*, 24 Atl. Rep. 725, la Corte Suprema de New Jersey dijo que:

"Un estatuto que es enmendado debe ser interpretado desde ese momento, y en cuanto se refiere a los actos realizados posteriormente, como si siempre hubiera existido la enmienda, y la enmienda misma se convierte íntegramente en una parte del estatuto original al ex-

tremo de que debe ser interpretada con vista de tal estatuto original según queda redactado después de haberse introducido las enmiendas, y las materias suprimidas por las enmiendas deben ser eliminadas.''

La Ley de 1917 es la actual ley constitucional de Puerto Rico y parece justo, lógico y apropiado aplicar el método por ella fijado para resolver el problema que surgió. No puede concebirse que la intención del Congreso fuera la de parar el funcionamiento de la Comisión creada por él mismo hasta que los nuevos nombramientos fueran hechos. Tenía que existir un espacio de tiempo razonable para reorganizar el organismo y mientras la reorganización se efectuaba era lo natural y correcto que el organismo continuara actuando en la forma en que estaba constituído.

En relación con la reorganización de municipios que, como es sabido, son creaciones de la Legislatura como fué la Comisión la creación del Congreso, pueden encontrarse precedentes que sostienen la conclusión de que la Comisión tenía derecho a continuar actuando hasta que se hicieran los nuevos nombramientos. Parece conveniente decir, antes de citar algunos de dichos casos, que el tiempo que empleó el Gobernador en nombrar los nuevos funcionarios no fué irrazonable. Creemos que sobre este extremo no hay cuestión suscitada por parte del demandante.

''La mera proclama de un gobernador cambiando la categoría de una ciudad de tercera clase a la de una de segunda,''—resolvió la Corte Suprema de Kansas en el caso de *Stewart* vs. *Adams*, 32 Pac. 123,—''no deja a la ciudad sin un gobierno municipal, y, necesariamente, hasta que tomen posesión los funcionarios de la nueva ciudad como una ciudad de segunda clase, la antigua forma de gobierno y los antiguos funcionarios deben continuar. *Campbell* vs. *Braden,* 3 Pac. Rep. 542, 31 Kan. 754; *Ritchie* vs. *City of South Topeka,* 16 Pac. Rep. 332, 38 Kan. 370.''

Y antes, en el caso de *Ritchie* vs. *City of South Topeka,* 16 Pac. Rep. 332, la propia corte había dicho y resuelto:

"¿Cuál era el *status* de la ciudad de South Topeka en esta época? Por la proclama del Gobernador de julio 4, 1886, se declaró que era una ciudad de segunda clase, pero su gobierno municipal no fué organizado totalmente hasta algún tiempo después de esa fecha. En el caso de *Campbell* vs. *Braden,* 31 Kan. 754, 3 Pac. Rep. 542, esta corte sugiere que necesariamente se requiere tiempo para completar tal organización, y en este caso no podemos decir que hubiera una demora irrazonable. No estaría completa hasta que sus funcionarios, incluyendo los concejales, fueran electos. La prueba adecuada de esa elección sería el recuento de los votos por las autoridades competentes. No se hizo esto al momento de imponerse la contribución; y, por tanto, la ciudad de South Topeka en esta época funcionaba, en tanto en cuanto se refiere a sus funcionarios, como una ciudad de tercera clase. Es necesario que en todo tiempo haya alguna clase de gobierno municipal, y la mera proclama de un gobernador cambiando la categoría de una ciudad de tercera clase a la de una de segunda no la deja sin un gobierno municipal y, necesariamente, hasta que los funcionarios municipales como ciudad de segunda clase tomasen posesión como tales, la antigua forma de gobierno y los antiguos funcionarios debían continuar en sus puestos. Creemos que la ordenanza de que se trata era válida.''

No hay duda, pues, de que la Comisión tal como estaba constituída pudo actuar. Ahora bien, ¿tenía facultades para otorgar la franquicia?

[6, 7] Dos proposiciones abarca el problema. Se alega por el demandante que la Comisión, de acuerdo con los propios términos del artículo 38 del Acta Orgánica de 1917 tal como estaba redactada antes de la enmienda, sólo tenía facultades para regular el servicio de porteadores públicos por ferrocarril, y se sostiene además que aunque las tuviera para regular toda clase de porteadores, jamás esas facultades alcanzarían a conceder un monopolio como lo ha concedido por la franquicia.

Examinemos la proposición primera.  Es cierto que por el artículo 38 del Acta Orgánica se confiere expresamente a la Asamblea Legislativa poder para decretar leyes relativas a la reglamentación de los precios, tarifas y servicio de los porteadores públicos por ferrocarril en Puerto Rico, y a la Comisión para poner en ejecución leyes de ese carácter mediante reglamentación adecuada, pero a nuestro juicio tal disposición que aparece en el último párrafo del artículo, se adoptó como una consecuencia de lo dispuesto en el párrafo anterior en relación con la no aplicabilidad en Puerto Rico de la Ley sobre comercio entre estados y sus enmiendas y las leyes sobre aparatos de seguridad a que se refiere el párrafo inmediatamente anterior.

Si se examina el comienzo del artículo 38 se verá cuán amplio es.  Prescribe que "Toda concesión de franquicias, derechos y privilegios de carácter público o cuasi público, será otorgada por una Comisión de Servicio Público . . ." Y la Legislatura de Puerto Rico, que en este respecto tiene facultades similares a las de cualquier estado de la Unión con la única limitación de que sus leyes pueden ser anuladas por el Congreso, desde el propio año de 1917 aprobó la Ley No. 70 de que antes hemos hecho mención y por ella todas las compañías que actuaran como porteadores públicos en general fueron sometidas a la jurisdicción de la Comisión. Quizás sea conveniente citar el artículo 52 de la dicha Ley No. 70 que comienza así: "La Comisión tendrá poder para otorgar franquicias, derechos, privilegios o concesiones para fines públicos o cuasi-públicos incluyendo el derecho de usar o cruzar carreteras, caminos o cauces de agua públicos . . ."

En el caso de *Kane* vs. *State of New Jersey*, 242 U. S. 160, la Corte Suprema de los Estados Unidos dijo:

"En ausencia de legislación nacional sobre la materia, la autoridad del estado para reglamentar el uso de sus carreteras por vehículos de motor que trafican en el comercio interestadual es aplicable tanto a los que pasan a través del estado como a aquellos que trafican solamente dentro del mismo."

No era necesaria, pues, la autorización especial del Congreso. La facultad residía en la Legislatura a la cual el. Congreso, artículo 25 de la Ley Orgánica, le concedió todos los poderes legislativos locales en Puerto Rico, y la Legislatura pudo delegar sus poderes en la Comisión.

"El poder para hacer leyes está investido en la legislatura, según las constituciones de todos los estados, y se ha creído que es muy dudoso que el departamento legislativo pueda delegar en cualquier otro cuerpo o autoridad el poder para conceder franquicias, en vista de que el ejercicio de tal autoridad envuelve una alta confianza creada y conferida para beneficio de aquellos que la han concedido, y tal confianza se le confiere a la legislatura. Sin embargo, parece estar ya resuelto que las legislaturas de los estados no solamente pueden ejercer su soberanía directamente, sino que pueden delegar cualquier parte de ella a cuerpos legislativos inferiores que a su juicio sea prudente para fines locales." 12 R.C.L. 187.

La circunstancia de que al enmendarse el artículo 38 por la Ley Butler las palabras "porteadores públicos por ferrocarril" se sustituyeran por "todos los porteadores públicos," no puede tener más alcance que el de desvanecer cualquier duda que pudiera suscitarse. No creemos que tenga aplicación a este caso la máxima *"Expressio unius est exclusio alterius,"* pues ya dijimos que el párrafo de que se trata tiene su explicación lógica como complemento del anterior. De todos modos, bien puede sostenerse que regía ya la enmienda cuando actuó la Comisión, aunque estuviera constituida en la forma en que lo estaba.

La segunda proposición es la que abarca el campo de investigación más amplio.

[8, 9] La franquicia de que se trata concede a la White Star el derecho exclusivo de transportar pasajeros en ómnibus entre San Juan, sus barrios y Río Piedras, usando como es consiguiente las calles y caminos públicos, mediante ciertas condiciones y sujeta al control de la Comisión. Para la fecha en que entraría plenamente en vigor la franquicia ya se habrían extinguido el certificado de necesidad y con-

veniencia del demandante a que nos hemos referido y la prórroga que se le concedió por la franquicia misma.

En la franquicia se proporciona al demandante el medio de vender su ómnibus. Se impone a la White Star el deber de comprarlo mediante una compensación razonable. Si surgiere desavenencia en el precio, la Comisión actuaría como árbitro. Esto no quiere decir que el demandante esté obligado a vender. El puede disponer de su propiedad en cualquiera otra forma. Lo que quiere decir es que la franquicia tuvo en cuenta todos los antecedentes y proveyó para decidir con respecto a todos los derechos envueltos en una forma equitativa.

Para los fines de este caso, puede aceptarse que la Comisión concedió el monopolio del servicio de transportación de pasajeros a la White Star. ¿Pudo hacerlo?

Cuando el Congreso de los Estados Unidos resolvió crear una Comisión de Servicio Público en Puerto Rico, lo hizo seguramente con el propósito de implantar en esta isla el moderno método de resolver las cuestiones relativas a las compañías de servicio público que venía funcionando desde hacía algún tiempo en muchos Estados de la Unión. Existen ciertos negocios que son o tienden a ser, por su propia naturaleza, monopolios. La comunidad sufría por los abusos que el ejercicio de tales monopolios implicaba. Se creyó que la verdadera solución consistía en que el Gobierno se hiciera cargo por sí mismo de la explotación de tales negocios. Sin embargo, la experiencia demostró que la solución era también muy arriesgada y entonces surgió la idea de crear ciertas comisiones que tuvieran la facultad de reglamentar, dirigir y controlar en su caso dichos negocios que continuarían ejercidos por los ciudadanos bien personalmente o constituídos en corporación.

Massachusetts fué el primer estado que adoptó esa forma de comisión. En el caso de *Wells* vs. *Gas & Electric Light Comrs.*, 84 N. E. 101, la Corte Suprema de dicho estado se expresó así:

"En primer lugar, con respecto a este departamento de servicio público, hemos adoptado en este estado una reglamentación legislativa contra los malos efectos del monopolio antes que aceptar la competencia entre dos o más corporaciones, en aquellos casos en que la competencia ha de aumentar grandemente el costo total de llenar las necesidades del público y cause quizá otros serios inconvenientes . . . El Estado, a través de esta autoridad, ha tomado control absoluto de estas corporaciones en todo lo que es necesario, a fin de evitar los abusos del monopolio . . . Respecto a estas clases de servicio público, y bajo ciertas condiciones, muchos creen que la reglamentación por el Estado es mejor que la competencia."

Otros estados adoptaron leyes similares a la de Massachusetts, que las cortes interpretaron con toda amplitud a fin de que el pensamiento que les dió vida pudiera realizarse plenamente. Bastará citar lo dicho por la Corte Suprema de Wisconsin, en el caso de *City of La Crosse* vs. *La Crosse Gas & Electric Co.,* 130 N. W. 530, 534:

"La empresa era grande. Se ha intervenido con pocas de mayor magnitud en nuestra historia legislativa. El resultado es un monumento significativo a la sabiduría legislativa. Es una maravilla que tal situación complicada fuera resuelta por el derecho escrito de tal suerte que venciera los ataques fructuosos que hasta entonces se habían hecho contra la validez de la ley . . ."

Y así, a virtud del nuevo sistema, se van resolviendo las difíciles situaciones creadas especialmente en relación con el tráfico público, concediéndose franquicias mediante las cuales el negocio ha sido puesto en manos de una sola dirección, bajo la inmediata inspección de la Comisión que representa y debe esperarse que garantice fielmente los intereses del pueblo.

La franquicia otorgada por la Comisión en este caso tuvo que serlo mediante una investigación de las condiciones existentes. No se alega en la demanda que tal investigación dejara de practicarse. Y la conclusión a que la Comisión llegara no es por sí misma ilegal, injusta, inusitada o arbitraria. Fué ciertamente extrema, pero aparentemente resulta la forma más lógica de resolver el problema

en bien de la comunidad en general. Estaba dentro de las facultades de la Comisión y proporciona, como se ha dicho, un medio equitativo al demandante para resarcirse del valor de la propiedad que tenía invertida en el negocio.

[10] Y hasta este punto es que debe y puede llegar el examen de la corte, especialmente tratándose como se trata de la concesión de un *injunction* preliminar, siguiendo el camino trazado por la Corte Suprema de los Estados Unidos en el caso de *New York* v. *McCall*, 245 U. S. 345, así:

"La corte de apelaciones de New York ha decidido que la Comisión de Servicio Público fué creada para desempeñar la importante misión de reglamentar los negocios de corporaciones públicas que la ley presume que la experiencia de los miembros de la Comisión los habilita especialmente para tratar los problemas presentados al confrontarse con los deberes y actividades de tales corporaciones; que las cortes, al revisar las decisiones de la Comisión, no tienen autoridad alguna para imponer su juicio al juicio de la Comisión, sino que están limitadas a determinar si la acción de la cual se querella fué caprichosa o arbitraria; o si cae claramente o no, dentro de las facultades de la Comisión, haber dictado la orden que en este caso se ataca. Esta interpretación de la ley de New York es terminante, y la definición, así enunciada, del poder de las cortes de ese estado para revisar las decisiones de la Comisión de Servicio Público, basada, como está parcialmente, en la sentencia dictada en el caso de *Interstate Commerce Commission* vs. *Illinois R. R. Co.*, 215 U. S. 452, 470, difiere ligeramente, si es que en algo difiere, de la definición dada por este tribunal a su propia facultad para revisar las decisiones de cuerpos administrativos similares, a la cual hemos llegado en muchos casos en que tales decisiones hemos tenido que analizar . . . . .

"El resultado de ésta y de decisiones similares es que si bien en casos como el presente esta corte se ha limitado a la cuestión federal envuelta y por lo tanto no ha tenido autoridad para substituir su criterio por el de una comisión administrativa sobre la procedencia o improcedencia de la orden de que se quejan, y no analizará o pesará la prueba que estuvo ante la comisión con el fin de determinar si es preponderante en pro o en contra de la conclusión a que se ha llegado, sin embargo, hará el examen de los autos que sea necesario para determinar si el derecho constitucional que se

alega, ha sido negado, como en el presente caso, si hubo una falta de vista o si hubo una decisión arbitraria o caprichosa por parte de la comisión que violó la cláusula sobre debido proceso de ley contenida en la Constitución. . . . .

    *       *       *       *       *       *       *

"Las corporaciones que dedican su propiedad a un uso público no pueden elegir aquí y allá, sirviendo solamente a las porciones de territorio cubiertas por sus franquicias que sea provechoso servir, deteniendo el desarrollo de las otras porciones y dejando a sus habitantes sin el servicio que solamente esas corporaciones pueden rendir. Corregir esta inclinación a dar servicio allí donde sólo es lucrativo y a abandonarlo allí donde no lo es, fué uno de los propósitos importantes para los cuales estas comisiones administrativas, investidas de grandes poderes, surgieron a la vida, con una organización y con unos deberes que las pusieron en condiciones de dar frente a problemas tales como el del caso presente; y opinamos de conformidad con la corte de apelaciones de New York al concluir que la decisión de la Comisión, de la cual se ha querellado, no fué arbitraria ni caprichosa sino que fué basada en evidencia tan substancial, que aún suponiendo que las cortes no estuvieran de acuerdo con la Comisión en cuanto a la sabiduría de la orden, esas cortes no tendrían autoridad alguna para substituir su fallo por el de la Comisión en aquellos casos que ella estime razonables o prudentes."

Para un estudio más amplio de las cuestiones envueltas, véase el tomo 42 de *Corpus Juris* que acaba de recibirse en esta Isla. Dedica más de ochocientas páginas a "Motor Vehicles." Especialmente en las páginas 616, 620, 641, 643, 648, 650, 651, 656, 681, 684 y 710 pueden encontrarse abundantes citas en apoyo de los principios en que fundamos esta opinión.

Por virtud de todo lo expuesto, *debe confirmarse la orden apelada.*

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. WOLF.

Este es un caso en que una franquicia u ordenanza concedida por la Comisión de Servicio Público empezaba a regir dentro de unas semanas, cuando surgió en esta corte el deber de revisar una resolución de la Corte de Distrito de

San Juan negando la expedición de un *injunction*. El tiempo que he tenido no ha sido suficiente para considerar o hacer una comparación de todas las autoridades o para tratar de agotar la cuestión.

Las demandadas en la corte inferior levantaron varias objeciones al remedio de *injunction* solicitado por el demandante. Se dijo, por ejemplo, que no se había demostrado que el demandante se vería privado de ningún derecho con motivo de la concesión de la ordenanza en este caso. Dado el hecho de que la ordenanza misma concedía el derecho exclusivo a la White Star Line a usar ómnibus (guaguas) por la carretera insular entre San Juan y Río Piedras, y dado el hecho de que dicha ordenanza se negaba a conceder un certificado de necesidad y conveniencia a cualesquiera otros ómnibus que traficaran por la misma ruta, mi opinión es que el demandante, quien ha estado explotando ómnibus por varios años y quien hasta ahora había cumplido con todos los reglamentos promulgados por la Comisión, ha presentado un caso apropiado de *injunction*. Su negocio en la localidad determinada en que lo efectuaba estaba inevitablemente llamado a ser destruído. Si bien en ciertos casos o en ciertas jurisdicciones podría él acudir al recurso de *mandamus,* sin embargo, la supuesta concesión de un monopolio por la Comisión de Servicio Público era un hecho tan importante que, si la Comisión de Servicio Público no tenía derecho a conceder tal derecho exclusivo, ningún otro remedio sería tan adecuado o eficaz como el recurso de *injunction*. Las siguientes autoridades demuestran que el *injunction* es el recurso adecuado en esta clase de casos: Sección 3 de la Ley de marzo 8, 1906; *City of Hammond, Peticionaria,* v. *Schappi Bus Line, Inc.,* decisión de la Corte Suprema de los Estados Unidos de noviembre 21, 1927; *City of Hammond, Peticionaria,* v. *Farina Bus Line,* decisión de la Corte Suprema de los Estados Unidos de noviembre 21, 1927. Los mismos casos resueltos por la Corte de Circuito de Apelaciones para el Séptimo Circuito,

11 Fed. (2nd.) 940, 943; 32 Corpus Juris 234; 42 Corpus Juris, *passim* y 657, notas 25 y 27.    El remedio de *injunction* abarca daños inminentes.

Las demandadas insistían en que la actual Comisión de Servicio Público no se había negado a expedir un certificado al apelante, pero en la contestación de las demandadas, la Comisión de Servicio Público demuestra suficientemente que ella había aceptado todas las actuaciones de la Comisión de Servicio Público anterior y que se disponía a ponerlas en vigor.

Por lo que he podido averiguar, convengo con la corte en que la Comisión de Servicio Público, según estaba constituída cuando se aprobó esta ordenanza o se concedió la franquicia, era una organización existente y que no quedó extinguida por la llamada Ley Butler.    La lectura de esa Ley demuestra que fué la intención del Congreso que la Comisión de Servicio Público continuara como tal y que tan sólo reorganizó los miembros que la componían.    Las diferencias mías con la mayoría de la corte estriban principalmente en los méritos del caso.

La concesión del monopolio que se trata de establecer es una tentativa de ejercer el poder de policía del estado. Si bien me consta que bajo ciertas circunstancias especiales, particularmente pueden surgir monopolios en algunos sitios, concediendo franquicia a una persona y negándosela a otra por determinadas rutas, *Modeste* v. *Conn. Co. et al.*, 117 Atl. 494, sin embargo, no he hallado un solo caso en que se haya, en términos directos y específicos, concedido ni intentado conceder un monopolio.    Tampoco he podido hallar ningún caso según el cual por la ruta principal y más traficada de una comunidad se haya tratado de establecer un monopolio, ya sea por la legislatura, por el municipio o por la Comisión de Servicio Público.    En una vía pública principal debe existir igualdad de oportunidades, y no se le debe conferir una preferencia decidida a ningún ómnibus o compañía de ómnibus sobre otras personas que se dediquen al

mismo negocio. Estoy bastante convencido de que no se ha demostrado, si pudiera demostrarse, razón satisfactoria alguna para la creación de este monopolio.

Asumiendo, como lo hace la corte, que el poder de policía va tan lejos, incumbe a la Legislatura determinar si debe concederse el monopolio. A pesar de sus amplios poderes, soy de opinión que las Comisiones de Servicio Público son cuerpos administrativos. Desde luego, hay ciertos poderes administrativos que están al borde de la línea. Esta corte consideró algunos de esos poderes en el caso de *El Pueblo* v. *Neagle,* 21 D.P.R. 356, en el cual estaban envueltos ciertos poderes administrativos del Tesorero, pero el monopolio que aquí se trata de establecer no es un acto administrativo. Esta es una cuestión altamente importante en la cual no sólo están interesados los dueños de ómnibus, sino el público en general que tiene derecho a viajar. Todo el público interesado tiene derecho a esperar que la Legislatura determine si ha surgido la necesidad de un monopolio.

El monopolio que se trata de establecer en el tráfico público de Puerto Rico, así como otros extremos de la ordenanza, tienen la naturaleza de legislación. La Legislatura no puede delegar ni ha delegado estos poderes legislativos en la Comisión de Servicio Público. En Puerto Rico tenemos una forma de gobierno republicano. Constitución de los Estados Unidos, artículo 40 de la Ley Foraker, su continuación en vigor por la Ley Jones, y otras disposiciones de la Carta Orgánica de Puerto Rico. En una forma de gobierno republicano, el derecho a establecer o crear un monopolio bajo éstas o parecidas condiciones debe residir primeramente en la Legislatura y no en la Comisión de Servicio Público.

De acuerdo con la Ley No. 70 de 1917, la Legislatura autorizó a la Comisión de Servicio Público a "reglamentar" y controlar el tráfico en los caminos públicos. El artículo 52 de esta Ley, tomo II, página 513, dispone como sigue:

· "La ·Comisión tendrá· poder. ·para otorgar franquicias, derechos, privilegios ·o concesiones para fines públicos o cuasi públicos incluyendo el derecho de .usar o cruzar carreteras, caminos o cauces, de agua públicos; y para otorgar franquicias, derechos, privilegios o concesiones para el aprovechamiento de las aguas públicas para fines públicos o particulares. No estará facultada para conceder el dominio o aprovechamiento de terrenos o propiedades públicas o para otorgar franquicias, derechos, privilegios o concesiones ·para usos particulares, excepción hecha del · aprovechamiento de aguas públicas, sin la aprobación de la Asamblea Legislativa."

Si bien la legislatura, bajo el artículo 39 autorizó a dicha Comisión a reglamentar el servicio público, sin embargo, a mi entender, no autorizó tal comisión a establecer esta clase de monopolios.

Si el motivo para la concesión de la ordenanza es la congestión del tráfico o el temor de que haya tal congestión, no hay indicio alguno de que se aliviará la misma concediendo el dominio a una sola compañía. Una de las condiciones de la franquicia que se proponen conceder es que la White Star Line debe mantener tantos ómnibus como exija la Comisión de Servicio Público. Me parece que la congestión del tráfico no sería afectada. Si el motivo es la falta de responsabilidad financiera en la mayoría de los dueños de ómnibus, esta falta podría corregirse, al igual que se ha hecho en muchos otros sitios, exigiendo al dueño de un ómnibus que preste una fianza adecuada. Ni la ordenanza ni los autos demuestran las razones o la necesidad para· la creación de un monopolio en Puerto Rico.

Se ha sostenido o sugerido que el derecho a usar ómnibus participa del carácter de un monopolio natural. A menos que sea controlado todo el tráfico, no veo, en realidad,.tal idea del monopolio natural. En adición a ómnibus, autocamiones privados, de carga, y automóviles de ·todas· clases trafican por los caminos públicos. Es distinto cuando se trata de la instalación de cañerías de agua o de gas, o de líneas eléctricas.

Se ha dado mucho énfasis al hecho de que en lo que se

refiere a otras corporaciones de servicio público, ferrocarriles, compañías de luz eléctrica, compañías de gas, y otras similares, se han concedido monopolios frecuentemente. Muchas de éstas participan del carácter de monopolios naturales, pero todas ellas tratan de obtener del gobierno o municipio derechos o privilegios distintos al derecho a traficar por una vía pública que ha existido desde tiempo inmemorial. Una compañía de ferrocarril, si bien atraviesa las carreteras públicas, en realidad no trafica sobre ellas, y el caso no es paralelo. Además, las compañías ferroviarias tienen el derecho de expropiación forzosa. Todas estas compañías obtienen privilegios especiales del estado, que se reserva el derecho de crear monopolios.

Las cortes toman conocimiento judicial del estado de los caminos públicos. A nada se me ha llamado la atención de lo cual la corte pueda tomar conocimiento judicial, que exigiría bajo las circunstancias actuales, la creación de un monopolio. Voy aún más lejos y me parece que la corte podía tomar conocimiento judicial de que hasta ahora no hay razón alguna para que se creara un monopolio.

En vista de que el monopolio es algo extraordinario en lo que respecta al tráfico público por carreteras usadas regularmente, cuando el demandante demostró, entre otras cosas, que iba a crearse un monopolio, presentó un caso *prima facie*. Si había alguna posibilidad de demostrar la necesidad de un monopolio, el peso de tal prueba recaía sobre la Comisión de Servicio Público, suponiendo que tuviera tal poder. Sostengo que bajo las circunstancias incumbía a las cortes de Puerto Rico decidir si existía la necesidad de la concesión del monopolio; que era una cuestión judicial y que según los hechos del caso no existe presunción alguna a favor de lo correcto de la ordenanza estableciendo el monopolio.

Las autoridades tienden a demostrar que si un dueño de un vehículo de motor u ómnibus cumple con todos los reglamentos, tiene derecho por medio de un mandamus o de algún

otro recurso a obligar a la Comisión de Servicio Público a que le conceda un certificado. Las apeladas dicen que la concesión o revocación de un permiso cae dentro de la discreción de la Comisión de Servicio Público. Esa es una clase de discreción que debe ser ejercida razonablemente, y las cortes procederán contra cualquier ejercicio irrazonable o arbitrario de la misma. En circunstancias ordinarias una distinción, como en el presente caso, sería un ejercicio no razonable de tal discreción.

Leyendo la opinión de la mayoría podría inferirse que el demandante quizás podría obtener algún remedio en una vista final. Para esa fecha si se pusiera la ordenanza en vigor, probablemente el demandante estaría excluído del tráfico. El objeto de un *injunction* preliminar es conservar el *status quo* mientras las partes están debatiendo derechos importantes. El negocio del demandante tal vez sería destruído totalmente. La corte de distrito indicó en junio que podía celebrarse una vista ante la corte en pleno. Si hubo suficientes dudas en ambas cortes, me parece que lo propio hubiese sido conservar los derechos del demandante en lo que se resolvía la cuestión. Tengo idea de que ésta hubiese sido la actitud de la Corte Suprema de los Estados Unidos, según está indicada en los casos de *Schappi* y *Farina* citados al principio de esta opinión. Es cierto que en dichos casos las cortes inferiores habían concedido *injunctions,* pero creo que el espíritu de dichas decisiones favorece mi posición.

Por los motivos que anteceden disiento de la opinión de la corte.