LE CUNO OIL COMPANY, Appellant,

v.

T. P. SMITH, Jr., et al., Appellees.

No. 6973.

Court of Civil Appeals of Texas.

Texarkana.

Sept. 26, 1957.

Rehearing Denied Oct. 24, 1957.

Clayton W. Feild, Jr., Marshall, Bill Cornelius, Jefferson, Wynne & Wynne, Angus G. Wynne, Dallas, for appellant.

Smith & Hall, Marshall, for appellees.

CHADICK, Chief Justice.

This is an accounting case. The judgment of the trial court is reformed, and as reformed, affirmed.

The appellees filed this suit against the LeCuno Oil Company and its several partners in April of 1954, alleging that LeCuno had failed and refused to account to them for the full ⅛ (royalty) of the price received by LeCuno for gas at the well. The defendants responded by motions to abate the suit for want of necessary parties and failure of appellees to exhaust their administrative remedies before the Federal Power Commission. These motions were overruled. In an original and later an amended answer, appellants pled defensively that the subject-matter of controversy was within the exclusive jurisdiction of the Federal Power Commission under the Natural Gas Act, 15 U.S.C.A. § 717 et seq., and that all rates, charges and field prices or changes therein for the royalty gas must be set by that agency. Answering further, it was alleged that during a part of the time since production another Federal Agency, the Office of Price Stabilization, had controlled the field price of gas produced under the leases involved, and had set a price of 10¢ per MCF at the wellhead and that appellees having been paid the 10¢ ceiling price, they could not come back after the expiration of the law creating the Office of Price Stabilization and sue for a greater price than had been set. For further answer, the appellant denied all the allegations of plaintiffs' peti-

tion, though it admitted it had taken gas from the wells sued upon by appellees from unitized acreage under the rules and regulations of the Railroad Commission, but insisted that appellant had paid all the royalties due to the appellees. Attached to the answer as an exhibit is the order of the Director of the Office of Price Stabilization and orders of the Federal Power Commission, relied upon by appellant. Then by cross-action LeCuno prayed the court to construe the leases involved and to reform the division order entered into between the parties.

Trial was before a jury on two special issues, and pursuant to jury answers, judgment was entered awarding an aggregate amount of $8,631.63 to the appellees, apportioned in accordance with their respective interest in the unitized leased premises, and denying appellant any relief on its cross-action.

Appellant brings forward 20 points of error and cites 30-odd cases and Rules in support of its contention. Appellees present eight counter-points and cite two cases and two rules. High respect for the opinion of counsel, and the earnestness with which it is urged that the price-fixing orders of the OPS and the rate-making authority of the FPC are involved in this case, has caused this court to study such contentions with unusual interest.

■ Preliminary to a discussion of contention last mentioned, the relationship of the parties should be noted. This relationship as shown by the record is distinguishable from that found in most cases of this kind. LeCuno, as assignee, holds the mineral leases which initially fix the rights of the parties as lessors and lessee, then in its capacity as lessee LeCuno, with ratification by the lessors, unitized the acreage creating a changed relationship between it and the original lessors. On occurrence of gas production the original lessors executed and delivered to LeCuno division orders creating still a different contractual relationship. In the usual cases growing out

of mineral development the lessee or producer and the gatherer or pipe line owner are different persons or corporations, while here LeCuno is both producer and pipe line operator. The contractual relationship created by the division orders permitted LeCuno as a producer, if it chose, to make a contract with LeCuno as gatherer, thus having the privilege of contracting with itself respecting prices of gas at the wellhead. However, no sale of that nature is under examination here. It is in evidence that LeCuno took delivery of the royalty gas involved at the wellhead, ran it through its processing plant and delivered it to certain interstate gas transmission companies under contracts of sale which appellees had no part in making at a price agreed upon between LeCuno and the transmission companies. Such sales to the transmission pipe lines were bona fide arm's length transactions as between LeCuno and the transmission lines so far as this record reveals. Under the contractual relationship described above, LeCuno's division orders requiring it to account to the appellees for their royalty gas on the basis of *"the price received at the wells by LeCuno"* would require that LeCuno exercise the highest good faith in any contract it entered disposing of the royalty owners' gas.

Most of the gas involved in this litigation was sold under a contract between LeCuno and the Mississippi River Fuel Corporation and what is said with respect to it is applicable to all other transmission lines involved.

Discussing first the OPS maximum price order, this record shows such order fixed a maximum price of *10¢ per MCF at the wellhead* on gas delivered by LeCuno to Mississippi River Fuel Corporation. The order does not fix a charge for gathering, transporting and processing gas. Throughout the time the OPS exercised jurisdiction, LeCuno was permitted and did charge and collect $.1225 per MCF for gas delivered. The transmission company paid monthly and at times divided the payment into two checks, one reflecting 10¢ per

MCF for gas and the other a charge of $.0225 per MCF of gas apparently allowing $.0225 as a gathering and processing charge. There is no evidence showing the OPS set, approved or was even aware that a charge for gathering and processing was being received by LeCuno.

Under the circumstances of this case as outlined in the preceding paragraphs, LeCuno as a gatherer and processor has agreed with appellees to pay them the price LeCuno received for the royalty gas, and it is undisputed that while the OPS order fixing a maximum price of 10¢ at the wellhead was in effect, appellees' royalty gas was sold, not at the wellhead, but after being processed and delivered at the tailgate of LeCuno's plant, and LeCuno received $.1225 per MCF for such gas.

█ There is nothing in the record to show that the OPS set or approved the $.0225 additional charge except that no action was taken to disallow the charge. If the $.0225 charge be considered as having been approved by FPC, it resulted in a windfall gain because under the jury findings the cost of gathering, etc., was only $.0125. Considering it as a windfall or excessive allowance, LeCuno acting in the best of good faith should account for the excess to the royalty owners because the excess was received by it as a result of the sale of the royalty gas.

Following the U. S. Supreme Court decision of June 7, 1954, in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, LeCuno as a precautionary measure while denying the jurisdiction of the FPC, filed a rate schedule and began operating under that agency's regulations. LeCuno by the simple act of filing with FPC its contract with Mississippi River Fuel Corp'n, Texas-Eastern Transmission Corp'n, and other interested transmission lines established as its rate the price set up in the respective contracts under rules of the FPC. These contracts each provided for a delivered price after processing (not a wellhead price) and

in these contracts no provision is made for a gathering and processing charge, as between the respective parties. In this latter respect the only time such charge appears in the record is where a note of explanation is appended to an invoice offered as an exhibit. The explanatory note said that $.0225 was permitted to be deducted from the sale price by the State of Texas in computing taxes.

█ The gas division orders executed by the appellees and delivered to LeCuno have a standard provision reading as follows: "Gas received under this division order shall be paid for to the parties entitled thereto according to the division of interest set out above *at the price received at the wells by LeCuno*." A construction of the whole language of each of the gas division orders requires a conclusion that the orders themselves in so far as a sale of gas is concerned are a contract by the royalty owners to sell the royalty gas to LeCuno as the same is produced for the price received for it by LeCuno at the well and do not constitute a sale of the gas in place. As shown in connection with another question later discussed in this opinion, there was no market for the gas at the well and the price received by LeCuno for the gas and for which it is accountable to the appellees would be the amount received by LeCuno for the gas, less the cost of dehydration, gathering, transporting and processing.

█ Respecting the FPC rates, the regulatory body simply made no effort to and did not fix a rate as between LeCuno and these litigants. The gathering and processing charge is an incident of cost occuring prior to delivery and is a part of the rate agreed upon by LeCuno and its gas purchasers and therefore included in the over-all rate FPC approved. This charge is one of the several variable factors making up the unit rate. It is not treated either by LeCuno, the transmission line purchasers or the FPC as a separate or severable charge but is merged into the fixed rate, without regard to amount or

whether there in fact is any cost of gathering and processing. The FPC wisely made no effort to come between the producer and its royalty owners and left the matter of costs and charges as between them to their own arrangement. The FPC rate sets an over-all amount per MCF of gas and no more tries to say what the gatherer will pay his producers for gas than it tries to tell him what he will pay his laborers for labor or suppliers for material. The regulatory authority of FPC is not involved in this suit. Nor can it be said that that agency has exclusive jurisdiction of the controversy between these litigants or even that there is any controversy between the litigants that the FPC in the exercise of its lawful authority might determine, see Magnolia Petroleum Co. v. Texas Illinois Natural Gas Pipeline Co., D.C., 130 F.Supp. 890; 4 Oil & Gas Reporter, 408–411.

Simply rendered it is the position of the appellant that: (1) It has accounted to the appellees for all royalty due them under maximum prices fixed by the OPS and the rates promulgated by the FPC, respectively; and (2) that if these two agencies had no jurisdiction, then the extent of its liability is the payment of ⅛ of the amount received for the gas at the well or the payment of ⅛ of the amount received at the point of delivery, less the actual cost of transporting, processing, dehydrating and delivering it.

For the purpose of the accounting phase of this litigation, all parties agree that division orders executed by the appellees and delivered to the appellant are the measure of their respective rights and state the amount of production each of the parties is to receive and provide that the pay therefor is to be ⅛ of the price which LeCuno receives for gas at the well. Le-Cuno contracted with the Mississippi River Fuel Corp'n to sell it the gas produced during the first two years of the contract a 12¢ per MCF and during the next two years thereof at 13¢ per MCF. This contract was operative at all times material to the suit. It is shown without question

that there existed no market for the gas at the well and that the gas was not sold at the well but at the tailgate of the processing plant, where it went into interstate gas transmission lines. Appellees concede that the cost of dehydrating is $.0025 cent per MCF.

■ Appellant contends and appellees agree that the fact to be found by Special Issue No. 1 is uncontroverted and that no issue of fact was raised by the proof. There is no contention made that the submission of Special Issue No. 1 impinged upon any right or privilege of the appellant. The submission of an immaterial issue is harmless under the circumstances. See Dofner v. Branard, Tex.Civ. App., 236 S.W.2d 544, er.ref.; Thomason v. Burch, Tex.Civ.App., 223 S.W.2d 320, er.ref.

■ The trial judge submitted to the jury Special Issue No. 2 reading as follows:

"What do you find from a preponderance of the evidence is a reasonable charge, if any, for gathering, transporting and compressing the gas used or sold off the land in question?"

The jury answered it: "1.25 cents per M.C.F." Appellant's objection in the trial court to the submission of this issue was:

"The defendant objects and excepts to Special Issue No. 2, because there is no lease of the plaintiffs which requires the defendant to make a reasonable charge for gathering, transporting and compressing the gas used or sold off the land in question. The measure of defendant's responsibility is the payment of ⅛th of the amount received for the gas at the Well, or the payment of ⅛th of the amount received at the point of delivery, less the actual cost of transporting, processing, dehydrating and delivering. In no contract is the defendant responsible to plaintiffs as to make a reasonable charge as testified to by the witnesses of the plaintiff in this cause."

The essence of the objection is that the jury should be required to find the actual cost of transporting, etc., rather than the reasonable cost or a reasonable charge therefor. In construing a section of the Fair Labor Standards Act, 29 U.S.C.A. § 203, a Federal District Judge in Walling v. Peavy-Wilson Lumber Co., D.C., 49 F. Supp. 846, at page 865, held reasonable cost defined as actual cost to be legally correct. And it appears to this court that if there is any difference between the two terms, "reasonable charge" is more flexible and liberal than actual cost, and if anything, favors the appellant. "Reasonable" has had many definitions by the courts and its meaning is shaded and varied by the context in which it is used, it is a relative term and the facts of a particular controversy may affect its meaning, frequently it is used to mean just, fair, honest or equitable. 36 Words and Phrases, Reasonable, p. 258. The special issue submitted empowered the jury to allow for expense or cost which was not actually incurred if the jury determined such charge to be just, fair, honest or equitable. Under an actual cost inquiry, the jury would be limited to cost actually and necessarily incurred, or if not necessary, incurred in the good-faith belief that it was necessary. There is no suggestion in the argument of appellant that any evidence of the actual cost incurred in transportation, etc., of the gas was rejected by the trial court and the jury thereby deprived of considering it under the issue as given. Under facts similar to these the Supreme Court in Danciger Oil & Refineries v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321, held that the producer was liable for the fair and reasonable value of the gas. Deducting the cost of gathering and treating from the good-faith sale price in the absence of a showing of other expense arrives at its fair and reasonable value. No perceivable harm has been done the appellant by submission of the issue as worded.

■■ The trial court rendered a take-nothing judgment on LeCuno's cross-action. The cross-action asked for a construction of the leases involved in this litigation and a reformation of the division orders. Had LeCuno pleaded and proved that it was induced to enter into the division orders by the fraud of appellees or through mutual mistake, it, of course, would be entitled to a reformation setting out the true agreement of the parties. See 36 Tex.Jur., p. 773, Sec. 31 and p. 779, Sec. 35. The record is devoid of proof of either fraud or mutual mistake, and the trial court probably on that basis was led to enter a take-nothing judgment. However, inspection of the record shows, as has been noted in another connection, that LeCuno and these parties are under a contractual relationship growing out of the mineral leases, the declaration of unitization made by LeCuno, which unitized not only these appellees' leases but others into production units, and the division orders. The declaration of unitization was not introduced into evidence. An inspection of the gas division orders shows that others than parties to this litigation, notably, Stanolind Oil & Gas Co., Gulf Oil Corp'n, and Travis Peak Oil Corp'n, are parties to the division orders, and the division orders refer to the declaration of unitization made by LeCuno and specifically ratifies it thus making the unitization declaration a part of the division orders. By the latter documents the royalty owners guarantee and warrant to LeCuno and to each other their respective interests as set out in the orders. From this inspection of the record, it appears that there is a lack of necessary (indispensable) parties to the action for reformation. In an action for reformation all parties to the contract to be reformed whose interests may be affected (diminished or enlarged) by a judgment are necessary parties. See 36 Tex.Jur. p. 767, Sec. 28. It was held in Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, that lessors of unitized acreage are joint owners or joint tenants of royalties reserved

in each of the several leases. A reformation of the royalty interest warranted by the appellees would affect (diminish or increase) the royalty interest of other royalty owners signing the division orders. The trial court should have dismissed the cross-action when it became apparent that there was a lack of necessary parties. Having failed to do so, it becomes the duty of this court to order the cross-action dismissed and the judgment of the trial court reformed in that respect. See King v. Commissioners' Court, 10 Tex.Civ.App. 114, 30 S.W. 257, and authorities collated under Sec. 88, Tex.Jur. p. 128.

Appellant requested the court to give eight special issues, the request was refused. The issues requested would have submitted the case either upon a theory similar to that upon which it was submitted as mentioned in the discussion of Special Issue No. 2 or upon appellant's theory that the OPS ceiling price and the FPC rate had application to the controversy. Having found that the submission made by the trial court was a satisfactory and proper submission of the ultimate controlling issue made by the pleading and proof and the orders of both federal agencies were immaterial to the issues in this case, there was no error in refusing the requested issues.

Complaint is also made by appellant to the admission in evidence of the opinion expressed by an expert witness that no charge should be made for the processing of gas produced from the various leases. The admission of expert testimony being to a great extent within the discretion of the trial judge and the testimony being the opinion of a witness whose qualification is not attacked by appellant, it is thought that the testimony as limited by the judge was admissible as an expression of the expert witness' opinion of reasonable cost incurred in gathering and processing the gas, and the weight to be given it was for the jury to determine.

All of appellant's points of error have been carefully studied and no reversible error found, the judgment of the trial court is affirmed, except as to the cross-action, and the judgment on the cross-action is ordered reformed and the cross-action dismissed.