COMISIÓN DE SERVICIO PÚBLICO, recurrente, *v.* METRO TAXICABS, INC., recurrida.

Número 12081.
*Sometido*: 29 de febrero de 1960. *Resuelto*: 8 de junio de 1961.

*J. B. Fernández Badillo, Secretario de Justicia, Edgar S. Belaval, Procurador Auxiliar, y Marcilio B. Carrasquillo, Nellie Ortiz Torres, Helios A. Zeno Villafañe y Roberto Rivera Escalera,* abogados de la recurrente; *F. Fernández Cuyar y Luis Tirado Géigel,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

La Metro Taxi Cabs, Inc., compareció ante la Comisión de Servicio Público en solicitud de que se le autorizara un aumento de 20 unidades en el número de sus taxímetros. Alegó que tenía 40 unidades en operación y que conjuntamente con su servicio de transportación en general, prestaba especialmente el servicio de concesiones exclusivas por contrato con Pan American World Airways, Caribe Hilton Hotel, Condado Beach Hotel, Hotel La Rada, Camp Buchanan Military Post y el Aeropuerto de Isla Grande e Internacional, viéndose obligada a destacar determinado número de unidades en las sub-estaciones que mantenía en tales sitios, en el Jack's Club y en otros, resultando así ya insuficientes las unidades de que disponía para distribución en cuanto a todos dichos sitios de servicio, particularmente ante la demanda progresiva del turismo y el uso más generalizado del taxi. En vista del incremento de los servicios que le eran requeridos, y para dar cumplimiento adecuado a los mismos, necesitaba operar las 20 unidades adicionales que solicitaba. La Comisión de Servicio Público celebró vistas sobre dicha solicitud y la peticionaria ofreció el testimonio de las siguientes personas:

BILL HARRIS. Declaró ser Gerente Auxiliar y Director de Transporte del Hotel Caribe Hilton. Mediante contrato el Hotel concedió a la Metro el derecho exclusivo de transportar en sus taxis su personal y sus huéspedes, para lo cual se proveyó el espacio necesario dentro de sus terrenos para que la Metro estacionara sus vehículos, con exclusión de otros porteadores. Originalmente exigían a la Metro tener disponibles 15 unidades, pero en vista del aumento de las necesidades se necesitaba ya un mínimo de 20 a 25 unidades. A cambio de esa concesión exclusiva la Metro pagaba una compensación fija al hotel. Cuando los vehículos asignados no eran suficientes, el portero del Caribe Hilton, pagado por

la Metro, llamaba a otras estaciones de dicha compañía pidiendo vehículos, y en la mayor parte de las ocasiones estos otros estaban ocupados. No se usaban otros taxis en esos casos porque hubiera sido en violación del contrato exclusivo. Aunque la calidad del servicio era buena, cuando algún huésped bajaba y no encontraba el taxi el testigo recibía una llamada, cosa que ocurría con frecuencia.

A. DALE AGEE. Declaró ser Jefe de la División de Aviación de la Autoridad de Transporte [Autoridad de los Puertos]. La Metro tenía una concesión exclusiva de la Autoridad para la transportación de los pasajeros por taxi. Exigía 21 unidades disponibles en el Aeropuerto y de necesitarse más en un determinado momento la Metro debía pedirlas. El contrato exclusivo se concedió por subasta.

BLANCA B. DE TIRADO. Dijo ser Gerente General de la Metro, operando desde 1946 bajo una franquicia que le concedió al principio 30 unidades, aumentada posteriormente a 40, 5 adicionales en ocasión del servicio al campamento Buchanan, y 5 más cuando el contrato del Caribe Hilton. La compañía prestaba servicio por concesiones especiales al Hilton, a la Pan American, al Aeropuerto Internacional, al campamento Buchanan, al Condado, contrato a ser firmado, La Rada y Jack's Club. En Buchanan le ofrecieron además el servicio de 20 *"green cars"* [1] del cual se hizo cargo, y necesitaban más carros. El Hilton le exigía 20 unidades y estaba quedando mal debido al Aeropuerto; en éste le exigían 21; 12 en Buchanan, 2 en La Rada, a Pan American daba un servicio de transportación a la tripulación continuamente, cada vez que llegaban, y necesitaba 4 vehículos diarios.

A una pregunta del Presidente de la Comisión en cuanto a si aún se había comprometido con el Condado "sin tener vehículos" contestó la Sra. Tirado: "Yo hice la solicitud,

---

[1] La Sala sentenciadora explicó en su opinión que *"green cars"* significaba vehículos que el personal militar utilizaba exclusivamente para usos oficiales.

por eso es que está pendiente. Ahí es que se está solicitando *porque yo no podría dar servicio en el Aeropuerto.* Hay que ver que yo estoy hasta las ocho de la noche. Yo estoy moviéndome aquí y allá. Váyase a tal sitio, del Caribe Hilton váyase a tal sitio. Los muchachos míos en realidad me respetan. A mí me ha llamado Agee a las cuatro de la mañana con un avión en el aeropuerto y yo he mandado cuatro carros para el aeropuerto, y me obedecen y me respetan los muchachos."

En cuanto a los vehículos de Buchanan declaró que no podían salir para afuera en ningún momento, y que los *"MP'S"* tenían órdenes de que si los veían salir los arrestaran. A preguntas sobre los 21 vehículos que debía disponer para el Aeropuerto contestó la Sra. Tirado: "Si, ya yo tengo mi cuadro para por la mañana a las 3:30 que se inicie el Aeropuerto, chequear el Caribe para ver las salidas que hay, si hay posibles salidas. Por la mañana toman su café, se desayunan y van para el Aeropuerto directamente, van desayunados cosa que no pierdan tiempo en la casa. Allí ellos desayunan y van al Aeropuerto a las cinco de la mañana. Se tira el primer avión y allí está la flota, al Caribe Hilton los que vienen de allá con el primer avión se paran en el Hilton porque todos los pasajeros vienen para el Hilton o para el Condado."

"P.—¿Qué número de vehículos tiene usted al servicio del público?
"R.—*Prácticamente ninguno."*

En adición, la Metro daba el servicio de los barcos de la Porto Rico Coal cada vez que llegaban. Finalmente manifestó la testigo: "A mí me parece que con esas 60 unidades *yo creo que me pueden bandear bastante.* Ahora mismo yo puedo decirle a usted donde está cada uno de los choferes míos y con qué carro está."

ANDREW MONTEATH. Dijo ser el Gerente de Estación encargado de los servicios de la Pan American en el

Aeropuerto Internacional. Alquilaban los servicios de la Metro para el transporte de pasajeros, su tripulación y empleados. No usaban los servicios de ninguna otra compañía. A veces había demora y tenían que esperar un poco de tiempo porque faltaban carros en el Aeropuerto.

ALBERTO LEBRÓN, Gerente de Tráfico y Venta de la *Eastern*. Dijo que sus pasajeros viajaban en los taxis del Aeropuerto que son de la Metro y no había quejas, excepto la falta de carros a veces. El servicio extra de taxis lo pedía a la compañía que servía el Aeropuerto. A preguntas del Presidente declaró que la tendencia era hacia el aumento en el número de pasajeros "y si una línea de taxis tiene la exclusiva en el Aeropuerto yo creo que debe tener más del suficiente."

AUGUSTO ARROYO, Mayor del ejército en la Oficina de Transportación del Fuerte Buchanan expuso que la Metro tenía dos contratos con el Puesto para servicio local entre un punto y otro dentro del campamento. Un contrato era para uso general, que pagaba el individuo dentro del área militar, y el otro era un servicio oficial que pagaba el ejército. El servicio general se contrató a subasta. Aunque no fiscalizaban directamente el servicio, les daban quejas de la falta de vehículos que no eran suficientes para la demanda interna del Puesto. Los taxis de afuera no podían entrar con los pasajeros, sino que debían dejarlos en la entrada y el taxi local los llevaba al sitio pertinente. En cuanto al servicio oficial, éste requería tener dos taxis en la entrada principal, dos en el *"Motor Pool"*, dos en la oficina del Comandante del Puesto y dos en la comandancia. Para el servicio general tenían entre 12 y 15 unidades. Explicó que la situación se había puesto seria en los últimos cuatro meses, cosa que tenía alguna relación con la apertura del Aeropuerto Internacional, y ello motivó una reunión de la comandancia con la empresa. Dijo que se le había enviado por el Comandante para declarar

sobre la necesidad de servicio, explicando que se trataba de la necesidad de servicio dentro del Puesto.

BARBARA PRESTON, Gerente de Reservaciones de las líneas aéreas "British" dijo que usaba el servicio de la Metro para los empleados y la tripulación, y a veces había demora por falta de taxis en el Aeropuerto.

Además de la prueba oral, la peticionaria presentó una carta fechada agosto 1, 1955, que le enviara el Jefe de la División de Aviación de la entonces Autoridad de Transporte, informándole que tenía muchas quejas debido a la imposibilidad del público de obtener taxis en las horas críticas de movimiento; hacía mención de la solicitud pendiente ante la Comisión y esperaba algún arreglo rápido. Otra comunicación del Provost Marshal del Fuerte Brooke, fechada 10 de octubre de 1955, informando que la Metro era la única compañía que había cumplido con los reglamentos del Puesto referentes a suficiente seguro y a la operación en el Puesto, y que la única queja era el servicio lento y a veces inexistente, debido a la falta de taxis. Pedía mejor servicio para su personal.

Hubo prueba en oposición a la solicitud, de dueños de taxis y otras entidades interesadas dedicadas al negocio. La misma fue al efecto de que había un número de taxis excesivo para las necesidades del público en general, y debido a ello no estaban ganando lo suficiente. El problema de la peticionaria le surgía como resultado del monopolio que tenía de la transportación en taxímetros.

Surge finalmente del récord, expresado por su Presidente, que la Comisión no intervenía en tales contratos de transportación exclusivos, y que al presentarse esta solicitud ya había una orden de la Comisión congelando el número de taxis en general y suspendiendo la concesión de nuevas franquicias.

Con miras a la solicitud y a la prueba, la Comisión denegó el aumento de las unidades solicitado. Entre otras consideraciones expuso lo siguiente:

"De un análisis de la prueba presentada por la peticionaria concluimos que el servicio que ésta viene prestando es eficiente y satisfactorio. Siendo esto un hecho cierto, no ha quedado establecida la conveniencia y necesidad pública que justifique un aumento de flota a la peticionaria. Independientemente de esto, entendemos que para resolver esta solicitud debemos decidir si el aumento de unidades beneficiaría al público en general. Hemos dicho anteriormente en esta Resolución que el fundamento primordial para solicitar el aumento de veinte (20) unidades es la necesidad que tiene la peticionaria de cumplir con ciertos alegados contratos, convenios o compromisos que ha contraído con distintas entidades. Durante la primera vista de este caso, la señora Blanca Tirado, Gerente General de la peticionaria, declaró que prácticamente no tenía taxis para el servicio del público. (Véase transcripción del récord taquigráfico, página 22). Todos los testigos presentados por la peticionaria son personas que resultarían beneficiadas por razón de estar en una u otra forma relacionadas con los alegados contratos......

"La necesidad y conveniencia pública no queda establecida por el mero hecho de que una empresa de servicio público no pueda cumplir con ciertos contratos celebrados por ella libre y voluntariamente con ciertas entidades. Si la peticionaria celebró esos contratos era porque estaba en condiciones de cumplirlos. No debe celebrar contratos que no puede cumplir para luego solicitar de esta Comisión que le provea los medios para cumplirlos.

"Somos del criterio de que al concedérsele una franquicia o certificado de conveniencia y necesidad a una empresa de servicio público, ésta debe balancear o ajustar sus operaciones y facilidades, de manera que pueda prestar un servicio eficiente y adecuado. Si así no lo hiciera y contrae obligaciones que menoscaban y van en detrimento del servicio, lo que procede es la rescisión del contrato de servicio por la otra parte contratante por incumplimiento del mismo.

"La Comisión en el presente caso no ha intervenido en los contratos celebrados por la peticionaria. Asimismo, no estamos en condiciones de enmnedar la franquicia para que ella pueda cumplir con los mismos.

"El concepto interés público no conlleva el derecho de un número exiguo de usuarios del servicio para exigir que dicho

servicio sea prestado por una empresa en particular. El derecho que existe y por el cual debe velar la Comisión es que el público en general pueda depender de ese srvicio; que el mismo sea adecuado y económico.

"Una enmienda a una franquicia solicitando un aumento en el número de vehículos concedidos, se concede luego de haberse demostrado afirmativamente la conveniencia y necesidad del servicio para el público en general y no mediante prueba de presión de grupos. Tampoco estamos en condiciones de hacer concesiones por el hecho de que cualquier empresa de servicio público haya contraído obligaciones contractuales o compromisos, los cuales no pueda cumplir por haberse extendido en su radio de operación sin tomar en consideración las facilidades con que cuenta para prestar el servicio. Esto es así sobre todo cuando se ha ignorado a este organismo para contraer tales obligaciones. La Comisión no está supuesta a hacer concesiones en casos como el presente, no empece lo ventajosa y lucrativa que ésta pueda resultar para la peticionaria. En un procedimiento para la concesión de una franquicia, certificado, derecho o privilegio o en que se solicite un aumento de las unidades ya concedidas, como en el presente caso, la Comisión debe decidir la cuestión a base de la existencia de la conveniencia y necesidad pública del servicio, y el deseo del solicitante y de sus testigos de hacer más negocio no es un factor a considerarse.

"La existencia de la conveniencia y necesidad pública es una cuestión esencialmente administrativa y para determinarla debemos considerar los siguientes factores:

"PRIMERO:—Si existe una necesidad pública que afecte substancialmente a una gran parte del público;

"SEGUNDO:—Si los porteadores existentes pueden cubrir esa necesidad; y,

"TERCERO:—Si la concesión a base de necesidad y conveniencia menoscabaría o afectaría las operaciones de los porteadores existentes en detrimento del interés público.

Veamos cuáles de estos factores quedaron probados por la prueba presentada tanto por la peticionaria como por los opositores.

Hemos argumentado ampliamente que la solicitud ni la prueba de la peticionaria han establecido que el público en general será afectado ni beneficiado substancialmente si esta

Comisión concediera los veinte (20) taxis adicionales. Por el contrario, los opositores probaron, fuera de toda duda, la existencia de los dos últimos factores.

Por todo lo cual esta Comisión declara SIN LUGAR la solicitud de aumento de flota radicada por la peticionaria en el caso de epígrafe."

La peticionaria apeló ante la Sala de San Juan del Tribunal Superior. Ley 70, 1917 (II), art. 78—27 L.P.R.A. sec. 227. Luego de oir a las partes, la Sala sentenciadora dictó un fallo revocando a la Comisión. Al terminar de hacer una exposición detallada de la prueba, a renglón seguido enfocó la situación así:

"Después de analizar en esa forma toda la prueba que tuvo ante sí la recurrida, está en orden juzgar si es procedente la solicitud de la peticionaria-apelante para obtención de veinte unidades adicionales de servicio, o es atendible la oposición que contra la misma hubo de formularse. ¿Justificó la apelante propiamente la necesidad del aumento solicitado de su flota de operación, a base de la necesidad y conveniencia pública, por razón de mayor demanda constante de sus servicios generalizados de carácter público, consistente en la transportación de pasajeros por taxis en el área metropolitana? Opinamos que es de considerar que indudablemente sí. ¿Quedó establecido algún apreciable fundamento verdadero de oposición al respecto? Entendemos que no."

No nos parece que la Sala sentenciadora asumió la posición correcta. Ese era el enfoque apropiado para la Comisión misma. Su función era una exclusivamente judicial: determinar si a la luz de los hechos, y demás circunstancias presentes en el récord certificado a ser apreciadas, el fallo de la Comisión era o no razonable, de acuerdo con la ley, y fundado en evidencia competente. Artículos 83 y 85 de la Ley 70 de 1917 (II)—27 L.P.R.A. secs. 232, 234. El Tribunal no ha de sustituir a la Comisión. *En el Asunto, etc. de Herminia Colón Vda. de Semidey*, 59 D.P.R. 248, (págs. 253–254) ; *Municipio de Guayanilla* v. *Com. Servicio Público*, 51 D.P.R. 374, (págs. 375–376) ; *Havemeyer* v. *Comisión Ser-*

*vicio Público*, 45 D.P.R. 698, (pág. 699), confirmado en *Commission* v. *Havemeyer*, 296 U. S. 506. Cf: *Comisión Servicio Público* v. *Tribunal Superior*, 78 D.P.R. 239, (págs. 253–254); *Santiago* v. *Comisión de Servicio Público*, 37 D.P.R. 500, (págs. 519–520); Pond, *A Treatise on the Law of Public Utilities*, Vol. 3, págs. 1925 et seq.

En *Commission* v. *Havemeyer*, supra, el Tribunal Supremo, confirmando a éste y revocando al de Apelaciones (74 F. 2d 637) dijo: "En la apelación la corte de distrito no estaba autorizada a sustituir por los de la Comisión sus propios puntos de vista en cuanto a cuál debía ser la acción justa o que debiera tomarse, o a ejercer función alguna legislativa, ejecutiva o administrativa. Su única jurisdicción era decidir a base del récord que le certificó la comisión si la orden era (1) razonable, (2) de conformidad a la ley, (3) basada en evidencia incompetente. 'Razonable' según se usa aquí significa no 'caprichosa', 'arbitraria' o 'confiscatoria.' Si la orden de cancelación era razonable en el sentido de que no transgredía los límites permisibles es una cuestión de derecho . . . El alcance permisible de las determinaciones y fallo de la corte es significativo. Sólo puede decidir las cuestiones de derecho levantadas por la apelación, y confirmar o revocar la orden o enviar el récord a la comisión para acción ulterior. La jurisdicción y deberes de la Corte Suprema y de la Corte de Circuito de Apelaciones son similares en todo sentido a las de la corte de distrito. Ninguna tiene otro poder o función que no sea la estrictamente judicial." Cf: *A. T. & Co.* v. *United States*, 299 U. S. 232, 236 (1936); *Fed. Power Comm'n* v. *Pacific Co.*, 307 U. S. 156, 160 (1939); *Board of Trade* v. *United States*, 314 U. S. 534, 548 (1942); *Securities Comm'n* v. *Chenery Corp.*, 332 U. S. 194, 207 (1947).

Asumida la posición dicha, la Sala se extendió en argumentos y consideraciones basados en su propia apreciación de la situación envuelta, consideraciones que podían representar más bien una expresión disidente dentro de la Comisión

misma. Concluyó que en su criterio se acreditó un aumento considerable y progresivo de pasajeros que requería transportación por taxi proveniente mayormente del creciente volumen de viajeros visitantes desde el Aeropuerto a los hoteles (lo cual se demostró ser así por la prueba) ; y también, que por razón de poseer concesiones para el servicio de transportación exclusiva en taxi, la Metro se encontraba disminuida en su capacidad para afrontar las exigencias del mismo, y no tenía el número suficiente de vehículos que le era necesario en no menos de 20 unidades adicionales y 60 en total; que si bien el servicio de la Metro era satisfactorio, la prueba había demostrado que resultaba insuficiente por falta de más vehículos; que en un enfoque *irreal* la Comisión había formulado la errada premisa de que no se había establecido la conveniencia y necesidad públicas que justificara el aumento de unidades, fundándose en la insostenible apreciación, *ajena* a los autos, de que la solicitud fue motivada primordialmente por la necesidad de la peticionaria de cumplir con ciertos contratos, convenios, compromisos contraídos con distintas entidades. (²)

Concluyó la Sala que lo esencialmente planteado no era la necesidad del cumplimiento de obligación contractual alguna, a pesar de la alegada existencia de contrato al respecto, sino la necesidad de la prestación efectiva del servicio de transportación de pasajeros "que con arreglo a concesiones establecidas mediante convenio con las respectivas entidades que pueden autorizarlas", venía llevando a cabo; que la prueba contraria no militaba en contra de la necesidad que tenía la peticionaria de dichos vehículos; que no era dable suponer

---

(²) Tal apreciación de la Comisión está ampliamente sostenida en el récord. La declaración de la Sra. Tirado no deja lugar a dudas sobre el particular, así como otra prueba que demuestra que se estaba pendiente de esta solicitud ante la Comisión para resolver problemas de insuficiencia en los contratos exclusivos. La prueba permite razonablemente concluir que la Metro no ofrecía servicio al público en general, sino al público cautivo dentro de sus contratos de transportación exclusiva, y en el caso de Buchanan, dentro de un área de interés particular.

que la Comisión, en el ejercicio prudente y consciente de su poder discrecional, no hubiera permitido a una empresa ampliar sus medios de operación comprobada la mayor exigencia pública; y que las entidades mencionadas no eran los usuarios del servicio de taxis de la peticionaria sino los individuos pasajeros. Que la Comisión debió dar paso a la solicitud plenamente justificada de la peticionaria y al no hacerlo, había "hecho mal uso de su discreción".

Dentro de los límites permisibles de revisión según se han señalado, la Sala sentenciadora no debió revocar a la Comisión a base de su propio enfoque del problema en manera distinta a como lo entendió aquélla. Sería pretender lo imposible tratar de apresar en una definición qué es lo razonable. Pero ante situaciones como éstas se han vertido conceptos aceptables. Razonable en tal caso se ha dicho ser aquello que se ajusta a la razón, a lo propio y adecuado; lo que se aviene a las circunstancias; no necesariamente lo que es mejor, sino lo que es apropiado y conveniente. Cf: *Ex parte Hall*, 195 Pac. 975, 976–977 (1920); *Carroll* v. *California Horse Racing Board*, 93 P.2d 266, 275 (1939); *Le Cuno Oil Co.* v. *Smith*, 306 S.W.2d 190, 195 (1957); *City of Lakewood* v. *Thormyer*, 154 N.E.2d 777, 791 (1958). O como se dijo en *Havenmeyer*, una decisión no caprichosa.

Es cierto, como entendió la Sala, que en último extremo los usuarios con insuficiente servicio eran los pasajeros individuales. Pero si esos pasajeros que formaban parte del público sufrían demora, ello era debido, en las circunstancias de este caso, a que junto al interés público intervenía un interés particular entre la peticionaria y esas entidades, quienes mutuamente derivaban beneficio material con las concesiones exclusivas de transportación. Los testigos que declararon que recibían quejas de sus huéspedes por falta de servicio no era porque la Comisión hubiera dejado de proveer a la comunidad del número de taxis necesario, sino porque ellos se impusieron por contrato la limitación de no usar

los demás vehículos disponibles. Enfocando objetivamente el problema que se creó, el mismo residía verdaderamente en el hecho de que por las razones que fueran, la Comisión no intervenía con esta contratación exclusiva de vehículos autorizados por ella para el servicio público—lo cual hasta cierto punto extraña, si se considera lo íntimamente ligados que estaban dichos contratos y el efecto de los mismos con el poder regulador de la Comisión, —de modo que no pasara precisamente lo que ocurría en este caso.

A tenor de la prueba en el récord y demás circunstancias a ser tomadas en cuenta, no se debió haber intervenido con el fallo de la Comisión. Al disponer del asunto la Comisión no venía obligada a hacerlo con miras exclusivamente al problema que se le creaba a esta compañía porteadora como consecuencia de las muchas obligaciones que sin intervención de la Comisión ella se impuso, sino tomando en cuenta todo el interés público general envuelto en la transportación mediante taxímetros.

*Se revoca la sentencia dictada por la Sala de San Juan del Tribunal Superior, y en su lugar se dictará otra confirmando la resolución de la Comisión de Servicio Público objeto de este recurso.*

Los Jueces Asociados Sres. Belaval, Hernández Matos y Rigau no intervinieron.