**CABOT CORPORATION, Petitioner,**

v.

**Martha BROWN, et al., Respondents.**

No. C–5995.

Supreme Court of Texas.

Dec. 9, 1987.

Rehearing Denied May 25, 1988.

Roger Townsend, Fulbright & Jaworski, Houston, for petitioner.

E.R. Norwood, Taylor & Norwood, Liberty, for respondents.

## OPINION

CAMPBELL, Justice.

This oil and gas case determines the implied duty of Cabot Corporation, lessee-operator, to reasonably market gas under a lease from Martha Brown and others, lessors. Based on a jury verdict, the trial court rendered judgment for Brown awarding damages of $424,083.14 and attorney's fees. The court of appeals affirmed the judgment of the trial court. 716 S.W.2d 656. We reverse and render in part and remand in part.

Cabot is the lessee-operator of the Cabot Kelln Gas Well No. 1 (the "Kelln Well") located in Lipscomb County, Texas. Brown is one of several lessor-royalty owners under a 1967 oil and gas lease to Cabot. The lease required Cabot to pay royalties based on the market value of the gas at the well in the event gas was used or sold off the premises. The Kelln Well began production in 1968. In January 1968, the lessors signed division orders which obligated Cabot to pay royalties based on the price determined by the Federal Power Commission

"if such sale be subject to the Federal Power Commission." [1]

In August 1967, Cabot and Transwestern Pipeline Company entered into a contract labeled "Exchange of Gas, Texas Panhandle." Under the contract, the Kelln gas is transported by Cabot through its pipeline to Transwestern's pipeline, which is part of an interstate gas transmission system extending from Texas to California. The Kelln gas is delivered into Transwestern's system in Roberts County, Texas, where it is measured and commingled with Transwestern gas to be sold in the interstate market. At that point, title to the Kelln Gas passes to Transwestern. The delivery point of the exchange gas received by Cabot from Transwestern is located in Gray County, Texas. There, Cabot takes title to an equivalent volume of gas transmitted from Transwestern's interstate pipeline. Under the exchange agreement, Cabot pays Transwestern 2¢ per MCF (thousand cubic feet) for transporting and exchanging the Kelln gas.

Under the Natural Gas Act, the FPC has jurisdiction over two broad categories of natural gas: gas being sold for resale in interstate commerce and gas being transported in interstate commerce. 15 U.S.C. § 717(b); see 15 U.S.C. § 3431. In September 1967, Cabot and Transwestern applied for and obtained a Certificate of Public Convenience and Necessity from the FPC under the Natural Gas Act of 1938, 15 U.S.C. §§ 717–717w. This certification was required for the construction of facilities and for the transportation of natural gas between the two companies.

From 1968 to 1974, Cabot used the exchange gas from Transwestern for its own use at its plant in Skellytown, Texas. However, this plant was permanently closed in 1974, and the exchange gas was rerouted to Cabot's Kingsmill Plant in Pampa. There, the exchange gas was commingled with gas produced or purchased by Cabot from the intrastate market. The majority of this commingled gas which re-

---

**1.** The Federal Power Commission (FPC) was the predecessor to the Federal Energy Regulatory Commission.

mained after processing was sold on the intrastate market at prices higher than the ceiling established by federal regulations. Because this sale of commingled gases provided a basis for assertion of FPC pricing jurisdiction, Cabot sought and obtained a "Henshaw exemption." *See* 15 U.S.C. § 717(c). Under this exemption, federal jurisdiction does not attach if the gas is received at the state boundary; is ultimately consumed within the state; and, is subject to regulation by a state commission, i.e. the Railroad Commission. *Id.* Under the Henshaw exemption, Cabot sold approximately 67% of the commingled gas at the Kingsmill Plant, for $1.35 per MCF.

Because this price exceeded the price upon which royalties were paid, Brown, in March 1981, sued Cabot claiming that Cabot had breached its duty to reasonably market the gas for the four years before the suit. Cabot had paid royalties on 38¢ per MCF from March 1977 to October 1980 and on 80¢ per MCF from October 1980 to the date of trial.

Brown alleged the Kelln Gas had not been dedicated to interstate commerce, that the FPC pricing jurisdiction had not been invoked, and that Cabot had paid royalties based on a price less than market value. Alternatively, Brown alleged that, even if the exchange amounted to a sale into interstate commerce, Cabot had an obligation under its duty to market to seek an abandonment of the exchange agreement from the FPC. By an abandonment, Cabot could have made the gas available for marketing in the intrastate market.

Based on a jury finding that Cabot had failed to reasonably market the Kelln Gas, the trial court rendered judgment for Brown. The court of appeals affirmed that judgment, holding the gas had not been dedicated to interstate commerce and the division orders signed by Brown did not alleviate Cabot's implied duty to reasonably market. 716 S.W.2d at 659–61. Our analysis begins with a brief review of Texas law regarding duties implied in oil and gas leases.

In Texas, there are three broad categories of covenants implied in all oil and gas leases. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex.1981). These implied covenants obligate the lessee to: (1) reasonably develop the premises, (2) protect the leasehold, and (3) manage and administer the lease. *Id.* Included within the covenant to manage and administer the lease is the duty to reasonably market the oil and gas produced from the premises. *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ. App.—El Paso 1979), *writ ref'd n.r.e per curiam*, 611 S.W.2d 610 (Tex.1980); *Le Cuno Oil Co. v. Smith*, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied*, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958). This duty is also two-pronged: the lessee must market the production with due diligence and obtain the best price reasonably possible. Under a gas royalty clause providing for royalties based on market value, the lessee has an obligation to obtain the best current price reasonably available. *See* R. Hemingway, *Law of Oil and Gas*, § 8.9(C) p. 442 (2d ed. 1983). The standard of care applied to test the performance of the lessee in marketing the gas is that of a reasonably prudent operator under the same or similar circumstances. *Alexander*, 622 S.W.2d at 567–68; *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187, 188 (Tex.1966).

As previously mentioned, Brown first alleges that the Kelln gas had not been dedicated to interstate commerce. As such, the FPC pricing jurisdiction had not been invoked and Cabot's royalty payments to Brown were based on a price less than market value. It is unnecessary for us to confront the legal question involving dedication to interstate commerce. The law with respect to division orders, set out below under Brown's second theory of recovery, determines her entitlement to damages during the period the division orders were in effect.

Under her second theory of recovery, Brown claimed that, even if the exchange was a dedication of gas to interstate commerce, Cabot had a duty as a reasonably prudent operator to seek an abandonment of its service to Transwestern. She intro-

duced expert testimony that a reasonably prudent operator would have sought an abandonment and that the abandonment would have been granted by the FPC. She claimed abandonment of jurisdiction by the FPC would have freed the gas from the exchange agreement and made it available for marketing at intrastate prices. Although we recognize in certain circumstances the lessee has a duty to seek favorable administrative action, *e.g.*, *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 569–70 (Tex.1981), we do not reach that issue here.

■ As noted earlier, Brown signed division orders in January 1968, which provide royalties would be based on prices determined by the FPC "if such sale be subject to the jurisdiction of the Federal Power Commission...." We conclude that Brown is bound by the interstate prices under our holding in *Exxon Corp v. Middleton*, 613 S.W.2d 240 (Tex.1981). In *Middleton*, we held that division orders executed by royalty owners, which obligated the lessees to pay royalties at lower rates than those required under the gas royalty clauses, were nevertheless binding on the royalty owners until revoked. 613 S.W.2d at 250–51. Brown was therefore limited to the interstate price allowed by federal regulation until the division orders were revoked. Under our *Middleton* holding, the division orders were not effectively revoked until Brown served Cabot with copies of her pleadings.

Brown submits that *Middleton* is distinguishable and that the division orders did not relieve Cabot of its implied duty to market the gas, citing *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979), *writ ref'd n.r.e. per curiam*, 611 S.W.2d 610 (Tex.1980) and *Le Cuno Oil Co. v. Smith*, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied*, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958). We disagree. The *Amoco Production* case involved a "proceeds" royalty clause in which royalties are based upon the amount realized from the sale of gas. The court of appeals held the lessee breach-

ed its implied duty to reasonably market the gas by entering into a long-term contract with no right to future redetermination based on market value increases. 579 S.W.2d at 287. In refusing the application for writ of error, no reversible error, we stated in a *per curiam* opinion that the court of appeal's holding should not be interpreted as implying an absolute duty to sell gas at market value under a "proceeds" royalty clause. 611 S.W.2d at 610. The court of appeals further held the division orders did not purport to relieve the lessee of its duty to market the gas in good faith. However, the court did not preclude the modification of express or implied lease terms by subsequent division orders executed and binding upon the parties. It merely stated that the particular division orders at issue, which referred to "net proceeds at the well," did not attempt to change the basis under the lease for calculating royalty payments. 579 S.W.2d at 288.

Likewise, the *Le Cuno Oil* case is inapplicable. In that case, the court stated generally that division orders, which provided for royalties based on the price received at the well, required the lessee to exercise good faith in any contract it entered disposing of the royalty owner's gas. Here, there is no dispute with Cabot's conduct in entering the 1967 contract with Transwestern. In fact, at that time interstate prices were higher than intrastate prices, and thus the exchange contract was beneficial and profitable to Brown. The *Le Cuno* court concluded that the division orders were binding, and since there was no market for the gas at the well, the lessee was accountable for the amount realized less the cost of dehydration, gathering, transporting and processing. 306 S.W.2d at 193.

■ The cases relied upon by Brown are distinguishable. *Exxon Corp. v. Middleton* is controlling. Although division orders do not supplant the lease contract, they are binding between the parties "for the time and to the extent that they have been or are being acted on and made the basis of settlements and payments, and

from the time that notice is given that settlements will not be made on the basis provided in them, they cease to be binding." *Exxon v. Middleton,* supra. Since Brown accepted the payments, she was bound by the division order until revocation. The division order was not effectively revoked until service of process on Cabot. Accordingly, we hold that Cabot is not liable to Brown for any damages up until the time Cabot was served.

■ Cabot further complains of the broad form submission of the controlling issue to the jury. The only issue submitted asked:

Did Cabot fail to reasonably market the Kelln gas during the period from September, 1974 to December 1, 1978?

The term "to reasonably market" means to undertake such actions in marketing the Kelln gas as would a reasonably prudent operator under the same or similar circumstances, having due regard both for the interest of Cabot and plaintiffs.

Answer: "Yes" or "No"

Answer: Yes.

Cabot complains that the issue required the jury to assume first whether the gas was dedicated to interstate commerce, and second, whether an abandonment would have been granted, had one been sought by Cabot. As such, Cabot argues that the trial court abused its discretion by submitting an overly broad issue. We disagree.

Our rules of procedure permit trial courts to submit issues in broad form. Tex.R.Civ.P. 277. Cabot's performance as a reasonable and prudent operator is the controlling question. Although this issue may include a combination of elements making up Brown's theory of recovery, its submission to the jury was proper under Rule 277. While our conclusions with regard to dedication of the gas to interstate commerce and the division orders signed by Brown may impact on her recovery, we hold that the issue of reasonableness was established by the evidence and properly submitted to the jury.

■ The trial court's judgment included a declaratory judgment that future royal-

ties be based on the maximum lawful price under Section 102 of the Natural Gas Policy Act of 1978. That part of the trial court judgment is erroneous because it speculates on whether the future market value of gas will exceed the ceiling prices established by federal regulation. The trial court lacked jurisdiction to decide such a speculative question. *See Fireman's Insurance Co. v. Burch* 442 S.W.2d 331, 333 (Tex.1968).

The parts of the court of appeals and trial court judgments declaring that Cabot is liable to Brown and the other lessors for failure to reasonably market the gas during the time the division orders were in effect are reversed. That part of the court of appeals judgment upholding the trial court submission of the jury issue is affirmed. This cause is remanded to the trial court for the sole purpose of allowing Brown and the other lessors to establish damages, if any, commencing after the division orders were revoked by service of citation on Cabot.

## ON MOTION FOR REHEARING

### KILGARLIN, Justice, dissenting.

I respectfully dissent. Contrary to the premise stated in its opinion, the court, in order to resolve this case on the basis of division orders, must address the interstate versus intrastate character of the Kelln gas. If the gas was not dedicated to interstate commerce, then royalties paid pursuant to the division orders were clearly erroneous, for those royalties were calculated based upon the FPC-determined interstate rate. Conversely, if the gas had been dedicated to interstate commerce, then the division orders were not erroneous, for the parties have stipulated that the FPC ceiling rate is the market value in the interstate market. When a party prepares erroneous division orders and retains the benefits, executed division orders do not bind underpaid royalty owners. *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690 (Tex.1986). Thus, *Gavenda* would afford relief to Brown if, but only if, the division orders are erroneous.

For gas to be dedicated to interstate commerce, there must be a sale for resale in interstate commerce. 15 U.S.C. § 717(b) (1982). It is undisputed that Transwestern sold some of the exchange gas in interstate commerce. Thus, the question is whether the exchange between Cabot and Transwestern was a sale under the federal regulatory scheme. The FPC has ruled, on similar facts, that an exchange of gas constituted a sale and brought the transaction within the jurisdiction of the FPC. *Shell Oil Co.*, 25 F.P.C. 1316 (1961); *Oklahoma Natural Gas Co.*, 23 F.P.C. 291, *reh'g denied*, 23 F.P.C. 531 (1960) (citing with approval *Deep South Oil Co. v. F.P.C.*, 247 F.2d 882, 888 (5th Cir.1957)). Brown relies upon *Public Service Electric & Gas Co. v. F.P.C.*, 371 F.2d 1 (3rd Cir.1967), to argue that the exchange constituted no more than the bailment of a fungible commodity. The exchange agreement between Cabot and Transwestern, in contradistinction to the agreement at issue in *Public Service*, provided that Cabot and Transwestern each acquired title to the exchanged gas at the respective delivery points. Further, the FPC's reasoning in *Shell Oil* and *Oklahoma Natural* is consistent with the Supreme Court's decision in *California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 369, 85 S.Ct. 486, 488, 13 L.Ed.2d 357 (1965), wherein the Court stated: "The result of our decisions is to make the sale of gas which crosses a state line at any stage of its movement from wellhead to ultimate consumption 'in interstate commerce' within the meaning of the Act." [1]

The Kelln gas, therefore, had been dedicated to interstate commerce. Thus, the division orders are not erroneous and *Gavenda* affords no relief to Brown.

Obviously, it is not because I question the court reaching the result it did absent a determination of interstate dedication that I dissent. The court of appeals was absolutely correct when it stated "division or-

ders do not alleviate [Cabot Corporation] from its implied duty to act in good faith in marketing the gas of its royalty owners." 716 S.W.2d at 660. Texas law recognizes an implied duty, arising from the lease, on the part of the lessee to reasonably market the oil and gas produced from the premises. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex.1981); *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ.App.–El Paso 1979), *writ ref'd n.r.e. per curiam*, 611 S.W.2d 610 (Tex.1980); *Le Cuno Oil Co. v. Smith*, 306 S.W.2d 190 (Tex.Civ.App. —Texarkana 1957, writ ref'd n.r.e.), *cert. denied*, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed. 2d 1147 (1958). Under a gas royalty clause providing for royalties based on market value, the lessee has an obligation to obtain the best current market price reasonably available. *See* R. Hemingway, *Law of Oil and Gas* § 8.9(C) (2d ed. 1983).

The court, however, agrees with Cabot that the executed division orders relieve Cabot of its implied duty to reasonably market the gas. The court distinguishes *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ. App.—El Paso 1979), *writ ref'd n.r.e. per curiam*, 611 S.W.2d 610 (Tex.1980). *First Baptist Church of Pyote* involved a proceeds lease royalty clause. The court of appeals recognized an implied duty to reasonably market. After holding that the lessee had breached this obligation, the court addressed the effect of the execution of division orders also referring to proceeds. The court observed that the division orders neither changed the basis for calculating royalty payments from the terms of the lease nor purported to relieve the lessee from its implied duty to market reasonably. The court held that the division orders did not diminish the duty owed to royalty owners. Thus, recovery on the implied covenant to market reasonably was

---

**1.** In *Lo-Vaca*, Lo-Vaca sold gas to El Paso Natural Gas Co. pursuant to an agreement restricting use of the gas to use as fuel for El Paso's operations (thus avoiding FPC jurisdiction because no sale for resale was contemplated). El Paso commingled the gas with gas intended for resale in interstate commerce. The Court held that the fact that a substantial part of the gas received from Lo-Vaca would be resold invoked federal jurisdiction over the entire transaction. 379 U.S. at 369, 85 S.Ct. at 488.

upheld despite the execution of division orders.

*First Baptist Church of Pyote,* to be sure, does not compel recovery for Brown in this case. The Cabot division orders do arguably modify or clarify the lease royalty provision: in effect, the FPC-ceiling price is recognized as market value. Neither, however, should *Exxon Corp. v. Middleton,* 613 S.W.2d 240 (Tex.1981), be read to preclude recovery for Brown. *Middleton* did not involve an action for breach of an implied covenant.

Division orders have engendered much confusion in the courts. Division orders provide a procedure for distributing the proceeds from the sale of oil and gas. They authorize and direct to whom and in what proportion to distribute funds from the sale of oil and gas. They do not rewrite or supplant leases or deeds. *See Gavenda,* 705 S.W.2d at 691 (and commentary cited therein).

One commentator, Earl A. Brown, discusses the purpose of division orders as follows:

> [T]he main purpose of the typical division order is to protect the *purchaser* of products produced on a lease in a division of the proceeds, paid by him, among those entitled to share in such proceeds, namely, the lessee and the royalty owners. It was never intended to afford a *lessee* the opportunity to amend the lease, relieve himself of lease obligations, and secure advantages over the lessor which he could not have asserted under the provisions of the lease.

E. Brown, *The Law of Oil and Gas Leases* § 16.02 (2d ed. 1985) (emphasis in original).

Professor Merrill argues that division orders should not be read to alleviate the lessee from its duties arising from covenants implied in the lease.

> [T]he purpose for which the [division] order is executed and the type of economic duress which prescribes it repel the implication that it is intended to affect the obligations of the operator to the royalty owner. The better reasoned decisions are in accordance with this view, and hence the mere execution of a division order, or the acceptance of payments in accordance therewith from the purchaser, ought not to preclude the royalty owner from asserting a breach of implied covenant obligation against the operator.

M. Merrill, *Covanants Implied in Oil and Gas Leases* § 209A (2d ed. Supp.1964).

This reasoning is not at odds with this court's prior pronouncements on the effect of executed division orders. In *Chicago Corp. v. Wall,* 156 Tex. 217, 293 S.W.2d 844 (1956), purchasers and operators, following division orders, paid out the correct total amount of proceeds owed but erred in the distribution, overpaying some royalty owners and underpaying others. In *Exxon v. Middleton,* 613 S.W.2d 240 (Tex.1981), although the leases at issue provided for royalties based on market value, royalties were distributed pursuant to division orders basing royalties on the contract price. We held in both cases that the division orders were binding until revoked. In neither case did the lessees or operators who prepared the division orders benefit from the discrepancies between the leases and division orders.

In *Stanolind Oil & Gas Co. v. Terrell,* 183 S.W.2d 743 (Tex.Civ.App.—Galveston 1944, writ ref'd), the operator prepared erroneous division orders and retained the benefits. In *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690 (Tex.1986), the operator similarly profited, at the royalty owner's expense, under erroneous division orders. We held in both cases that the division orders were not binding.

Although none of the above division order cases involved claims of breached implied covenants, our reasoning in those cases should be instructive to our debate here. This court has displayed a willingness to recognize as non-binding division orders in cases where the operator or lessee unjustly benefits. Implicit is the notion that division orders should not afford a lessee the opportunity to relieve himself of lease obligations or secure advantages over the lessor which he could not have asserted under the provisions of the lease. This guiding principle leads me to conclude that

the division orders should not preclude Brown from recovery for breach of the implied covenant to market reasonably.

I can envision no case that would depict as well the inequity of the result reached by the court today. Cabot reaped the benefits of FPC jurisdiction over the exchange with Transwestern, paying out royalties based on the lower interstate market rate. Yet Cabot sold the gas on the higher intrastate market. The Henshaw Amendment to the Natural Gas Act provides that "the provisions of [the Natural Gas Act] shall not apply" if the gas is received at the state boundary; is ultimately consumed within the state; and is subject to regulation by a state commission. 15 U.S.C. § 717(c) (1982). By seeking and obtaining exempt status, Cabot was thus freed from FPC pricing jurisdiction as to the sales to Pioneer and use by Cabot of the gas for its own operations. Brown did not share in the benefits of the higher intrastate prices brought by the gas.

Brown claims that Cabot had a duty as a reasonably prudent operator to seek abandonment. *See* 15 U.S.C. § 717f (1982). Had the FPC approved such a request, then FPC jurisdiction would not have applied to the transaction between Cabot and Transwestern. The FPC interstate price ceiling would never have been applicable. Brown introduced expert testimony that the abandonment would have been granted by the FPC.[2] This court has recognized that the reasonably prudent operator standard may, in certain circumstances, encompass a duty to seek favorable administrative action. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 569–70 (Tex. 1981). The jury found that Cabot had failed to reasonably market the gas. To hold Cabot unaccountable for this breach, saying it was protected by an executed division order, is mere subterfuge.

I am not unmindful of the need for stability in the oil and gas industry. *See Gavenda*, 705 S.W.2d at 692. However, the standard of care appropriate to the duty to market reasonably is that of the reasonably prudent operator under the same or similar circumstances. *Alexander*, 622 S.W.2d at 567–68; *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187, 188 (Tex.1966). This standard gives the operator some latitude. Professional discretion is allowed, and properly so. I would not want oil and gas producers subjected to frivolous lawsuits. But where a jury finds that an operator has failed to meet this standard of care, then he should not be protected by the executed division order. To do so would relieve him of lease obligations. The court today ignores our past pronouncements on division orders and reaches a result that is palpably unfair.

MAUZY, J., joins in this dissenting opinion.

---

**2.** Cabot's no evidence argument as to this issue    is unconvincing.